Adam Alper (SBN: 196834)
adam.alper@kirkland.com
Laura Vartain Horn (SBN: 258485)
laura.vartain@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

Michael W. De Vries (SBN: 211001)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:    (714) 982-9922
Facsimile:    (714) 982-8844

Leslie M. Schmidt (*pro hac vice forthcoming*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Maria M. Beltran (SBN: 327237)
maria.beltran@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

*Attorneys for Plaintiff Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC., | CASE NO. 5:25-CV-7105 |
| Plaintiff, | **COMPLAINT FOR TRADE SECRET MISAPPROPRIATION AND BREACH OF CONTRACT** |
| v. | |
| CHEN SHI, GUANGDONG OPPO MOBILE TELECOMMUNICATIONS CORP., LTD., and INNOPEAK TECHNOLOGY, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Apple Inc. ("Apple") brings this lawsuit against its former employee, Chen Shi, Ph.D. ("Dr. Shi") and his new employers, Guangdong Oppo Mobile Telecommunications Corp., Ltd. ("OPPO") and InnoPeak Technology, Inc. ("InnoPeak") (OPPO and InnoPeak together, "OPPO Defendants"), for trade secret misappropriation and breach of contract and alleges as follows:

## INTRODUCTION

1.    Apple engineers spend hundreds of thousands of hours bringing innovative products, features, and services to market to inspire and delight its customers around the world.  These products include Apple Watch.

2.    In 2015, Apple introduced Apple Watch, a wearable device with integrated health, fitness, safety and connectivity features to help people lead healthier lives.  Apple has since invested hundreds of millions of dollars to improve upon its features and services, including the optical sensors that enable the detailed monitoring of health information.

3.    Dr. Shi worked for Apple as a highly compensated Sensor System Architect on the Apple Watch team between January 2020 and June 2025.  Over this period, Apple entrusted him with valuable trade secret information about Apple Watch, including its design and development documentation, internal specifications, and product roadmap.

4.    Dr. Shi knew well the importance of maintaining the confidentiality of this information. Before starting his first day at Apple, he executed a Confidentiality and Intellectual Property Agreement ("IPA") to memorialize this understanding.  Apple also reminded him of it regularly.

5.    Despite his legal obligations, and his ethical obligations to his fellow engineers to maintain the secrecy of their work product, Dr. Shi conspired to steal Apple's trade secrets relating to Apple Watch and to disclose them to his new employers, OPPO and InnoPeak.

6.    Starting in April 2025, Dr. Shi sought out employment with the OPPO Defendants and was recruited by the highest levels of the OPPO Defendants' leadership, including the President of its U.S. Research Center and its Vice President of Health.  In early June 2025, Dr. Shi formally signed his offer letter to join the OPPO Defendants' wearables team and subsequently told them that his last day with Apple would be June 27, 2025.  Dr. Shi did not disclose, however, that his new employers were the OPPO Defendants.  Instead, he lied to his colleagues, falsely claiming that he was returning to China to tend to

his elderly parents and had no plans to seek new employment.

7.     In the weeks leading up to his departure, Dr. Shi undertook to gather highly sensitive information about Apple Watch to assist the OPPO Defendants' development of a competing wearable. Concealing his impending employment with a direct competitor, Dr. Shi set up and attended *dozens* of one-on-one meetings with Apple Watch technical team members to learn about their ongoing research and development efforts, including their work on optical sensors, temperature sensors, and ECG sensors.

8.     Dr. Shi also gathered Apple confidential documents detailing key aspects of its health-sensing technologies for the OPPO Defendants' benefit.  As one example, late at night just three days before leaving Apple, Dr. Shi downloaded *63* documents from a protected Box folder.  He then transferred them to a USB drive one day before his departure.

9.     Dr. Shi also knew well that his conduct was inappropriate.  Before downloading Apple confidential information off its networks, Dr. Shi searched the Internet for "how to wipe out [a] macbook." And in the middle of downloading information from Apple's shared drives, he searched, "Can somebody see if I've opened a file on a shared drive?"

10.    The OPPO Defendants also knew well of Dr. Shi's activities, which they condoned and encouraged.  In a June 4, 2025 message to Zijing Zeng, Ph.D., OPPO's Vice President of Health, Dr. Shi confirmed his start date with the OPPO Defendants and his nefarious actions:

> [original message in Chinese]
>
> "我计划 6/30 入职 这周就和组里提离职 最近也在内部看各种资料 找不少人 1:1 尽量多收集信息 之后和你们分享."
>
> [English translation of message (emphasis added)]
>
> "I'm planning to start on 6/30.  This week I'll inform my team about my resignation.  ***Lately, I've also been reviewing various internal materials and doing a lot of 1:1 meetings in an effort to collect as much information as possible—will share with you all later.***"

Rather than protest Dr. Shi's clearly inappropriate conduct, Dr. Zeng responded "alright" and sent an "OK" emoji.

11.    Trade secret theft by former employees for new employers is always wrong.  Here, allowing Dr. Shi's and the OPPO Defendants' actions to go unpunished would undermine Apple's commitment to innovation and its substantial investments in pioneering technologies like Apple Watch.

It also would risk destroying the value of Apple's trade secrets and provide a competitor with an unfair advantage.

12.    Apple therefore brings this lawsuit to protect the hard work and creative efforts of its talented engineers and stop its former employee, Dr. Shi, and his new employers, the OPPO Defendants, from incorporating Apple's confidential health sensor and other technologies into competing products.

**THE PARTIES**

13.    Apple is a California corporation having its headquarters and principal place of business at One Apple Park Way, Cupertino, California 95014.  Founded in 1976, Apple is a global technology company renowned for its innovative consumer electronic products, including the iPhone, iPad, Apple Watch, AirPods, and Mac computers.  Apple sets the standard for consumer devices by seamlessly blending cutting-edge technology with sleek, user-friendly design and by continually expanding its offerings through substantial investments in research and development.

14.    A resident of San Jose, California, Dr. Shi worked at Apple's facilities in Santa Clara County, California from January 2020 until June 26, 2025, when he departed from his role as a Sensor System Architect.  According to messages he left on his Apple-issued work iPhone, he currently works at OPPO's U.S. office, where he leads a team developing sensing technology.

15.    OPPO is a Chinese corporation having its principal place of business at 18 Haibin Road, Wusha, Chang'an Town, Dongguan, China.  OPPO owns and operates a "Research Center" in the heart of Silicon Valley that it operates under both the "OPPO" or "InnoPeak" brands.

16.    InnoPeak apparently is a California corporation having its principal place of business at 2479 East Bayshore Road, Suite 110, Palo Alto, California, 94303.[1]

17.    As their branding on their U.S. Research Center confirms, InnoPeak and OPPO use both names interchangeably for their operations.  Others view them as indistinguishable.  For example, in his messages while still employed by Apple, Dr. Shi noted that he had accepted a job offer with "a Chinese company called OPPO," whose "US branch operates under the name InnoPeak."

---

[1]    *See* Ex. 1, https://www.innopeaktech.com/open-positions-1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURISDICTION

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises out of the violation of a federal law, the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.

19.    This Court also has supplemental jurisdiction over the asserted state law claim under 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

20.    This Court has personal jurisdiction over Dr. Shi because he resides in San Jose, California and thus is at home in this District.  This Court also has personal jurisdiction over Dr. Shi based on his purposeful connections with California, including those that form the basis of the trade secret misappropriation and breach of contract claims in this Complaint.  The Court also has personal jurisdiction over Dr. Shi because employees at Apple developed the trade secrets at issue at its offices in Santa Clara County, California and because Apple owns those trade secrets and is harmed in this District by Defendants' trade secret misappropriation and breach of contract.

21.    The Court has personal jurisdiction over Dr. Shi based on his IPA.  There, he "consent[ed] to personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California" and agreed that any "judicial action between the parties relating to this Agreement [would] take place in Santa Clara County, California."[2]

22.    This Court has personal jurisdiction over InnoPeak because it purports to be a corporation registered in the state of California with the Principal office at 2479 East Bayshore Road, Suite 110, Palo Alto, California 94303.  On its website, InnoPeak advertises its presence in this jurisdiction, stating: "Based in the heart of Silicon Valley, InnoPeak Technology performs cutting-edge research in smartphone technologies, including but are not limited to computer vision, and video and image processing."[3]  InnoPeak also is actively hiring for various research and development engineer and scientist positions in its Palo Alto office.

23.    This Court has specific personal jurisdiction over OPPO, which conducts business in this

---

[2]    Ex. 2, Apple Confidentiality and Intellectual Property Agreement (executed by Dr. Shi) § VI.B ("Governing Law").

[3]    Ex. 3, https://www.innopeaktech.com/.

District.  On its global website, OPPO highlights its Silicon Valley Research Center as one of its international "Research Institutes."[4]  OPPO's LinkedIn account advertises job openings in Palo Alto, California, and many of those openings are identical to those listed on InnoPeak's career page.[5]

24.    Consistent with how OPPO publicly refers to its operations in Silicon Valley, Dr. Shi and OPPO employees, including Dr. Zijing Zeng, repeatedly refers to "OPPO's U.S. research center."  Job postings linked to InnoPeak's website, for example, refer to InnoPeak as "OPPO['s] US Research Center."[6]  A recent InnoPeak job posting for a "Backend Engineer—Wearable Product" position describes the role as an "OPPO US Research Center" position, stating:

> OPPO US Research Center is seeking an experienced and highly motivated Backend Engineer to join our wearable product development team.  In this role, you will be responsible for building and maintaining high-performance backend systems that power our next-generation smart devices.  You'll collaborate with cross-functional teams to ensure scalable and reliable infrastructure that supports business innovation and global product deployment.[7]

25.    The "Benefits" section of this posting further states that "OPPO [not InnoPeak] is proud to be an equal opportunity workplace."[8]

26.    Correspondence between Dr. Shi and OPPO employees such as Dr. Zeng indicates their awareness of OPPO's U.S. Research Center and repeatedly refer to it.  Dr. Shi actually met with the President of its U.S. Research Center, Jin Pi, and other OPPO employees at the center in May 2025.  When communicating with Dr. Shi about working for the OPPO Defendants, Dr. Zeng offered him the

---

[4]    *See, e.g.,* Ex. 4, https://www.oppo.com/en/newsroom/stories/oppo-is-innovating-in-india/ ("Along with the Hyderabad R&D center in India, OPPO has a further six Research Institutes worldwide in Beijing, Shanghai, Shenzhen, Dongguan, Silicon Valley, and Yokohama."); https://www.oppo.com/en/newsroom/stories/oppo-japan-research-center-imaging-future/ ("OPPO currently runs six Research Institutes in Beijing, Shanghai, Shenzhen, Dongguan, Silicon Valley (United States), and Yokohama (Japan)."); *see also* Ex. 5, https://baike.baidu.com/reference/56981726/533aYdO6cr3_z3kATPGJnvr3OnnDPtSlvbPQWuBzzqIP0 XOpRYGrTo0x6MA6_LlkGwaFs5YtcN4amO3lCEtE5uoQdfA1Rqogm3P9UTTA1_2-u4Rt (OPPO's Baidu Baike page cites to this news reporting page showing the same information).

[5]    *See, e.g.,* Ex. 6, https://www.linkedin.com/jobs/oppo-jobs-worldwide?f_C=2852649&trk=top-card_top-card-primary-button-top-card-primary-cta&position=1&pageNum=0.

[6]    *See, e.g.,* Ex. 7, https://apply.workable.com/innopeaktech/j/1B253DB14C/.

[7]    *See* Ex. 7, https://apply.workable.com/innopeaktech/j/1B253DB14C/.

[8]    *See* Ex. 7, https://apply.workable.com/innopeaktech/j/1B253DB14C/

flexibility to work in either Palo Alto or OPPO's Guangdong headquarters.  When writing a former supervisor at a different company about his OPPO job offer, Dr. Shi indicated that he would be affiliated with InnoPeak, which he characterized as OPPO's "US branch."  Messages between Dr. Shi and a "Recruitment Manager from OPPO" on June 11, 2025 note that Dr. Shi had "signed a U.S. contract."  And when messaging Dr. Zeng about a meeting "at the U.S. research center" on June 24, 2025, Dr. Shi wrote: "我下周一入职 听说你正好过来出差 咱到时美研所见."  This translates to: "I'll be onboarding next Monday.  I heard you'll be here on a business trip.  We'll meet at the U.S. research center then."

27.    OPPO Research's Baidu Baike page also refers to its U.S. Research Center, stating: "OPPO研究院成立于2018年4月，总部设立于深圳，下设北京、上海、东莞、日本横滨和美国硅谷等六大研究所."  This translates to: "Founded in April 2018, OPPO Research Institute is headquartered in Shenzhen with six subordinate research institutes located in Beijing, Shanghai, Dongguan, Yokohama (Japan) and Silicon Valley (USA)."  InnoPeak's official website features a "Research" page showcasing several research projects and publications.[9]  The description for one of these projects links directly to a GitHub repository labeled "oppo-us-research."[10]  Many followers of this repository self-identify as employees of InnoPeak[11] or of OPPO's U.S. Research Center.[12]

28.    InnoPeak employees similarly identify themselves as OPPO employees on LinkedIn and other publicly available forums.  For example, InnoPeak research engineer Changjiang Cai describes himself as a "senior research engineer… at InnoPeak Technology, Inc. (a.k.a. OPPO US Research Center) at Palo Alto, CA, USA" on his LinkedIn page.[13]  Similarly, at least thirty current OPPO employees identify themselves as based in this District on LinkedIn.[14]

29.    Chinese video sharing site Bilibili also hosts a video entitled "探秘中国公司在美国硅谷的研发中心！到底有多少大神牛人？" This translates to: "Exploring the

---

[9]    *See* Ex. 8, https://www.innopeaktech.com/research.

[10]    Ex. 9, https://www.innopeaktech.com/research-blog/2022/1/17/monoindoor-towards-good-practice-of-self-supervised-monocular-depth-estimation-for-indoor-environments-6bdea-ym6d6-a5z2n?rq=oppo; Ex. 10, https://github.com/oppo-us-research.

[11]    *See, e.g.,* Ex. 11, https://github.com/kuantingchen04.

[12]    *See, e.g.,* Ex. 12, https://github.com/ShawnXu10; Ex. 13, https://github.com/Huangying-Zhan.

[13]    Ex. 14, LinkedIn Profiles.

[14]    Ex. 14, LinkedIn Profiles.

R&D centers of Chinese companies in Silicon Valley! How many top talents and experts are there exactly."[15]  In that video, Jerry Kowal,[16] a popular American influencer in China discusses his visit to OPPO's U.S. Research Center at InnoPeak's 2479 East Bayshore Road address.  Mr. Kowal showcases OPPO's office, interviews employees, and discusses the research that the OPPO Defendants conduct at that address.  The name "InnoPeak" does not appear in the video at all.  Instead, the "OPPO" logos appear throughout the office environment and even on employees' shirts.

30.     Further, InnoPeak's registered office at 2479 East Bayshore Road has a large permanent sign with the name "OPPO" at the top and "2479" (its building number), at the bottom, as shown below:



31.     The building's entrance doors also use the names "OPPO" and "InnoPeak" interchangeably.  For example, a sign on one door instructs visitors to contact someone at an InnoPeak email address, and the door immediately next to it bears the word, "OPPO."

32.     The Court also has specific jurisdiction over OPPO because it has sufficient minimum contacts with this District and has intentionally done business in this jurisdiction.  OPPO has attended

---

[15]  Ex. 15, https://www.bilibili.com/video/BV1ir4y187Gh/; *see also* Ex. 16, https://www.linkedin.com/feed/update/urn:li:activity:6928378225895120896/ (noting that he "[h]ad the pleasure of meeting Jerry K. and making a brief appearance as he toured our research center.  We have lots of job openings in Palo Alto and Seattle if you want to join!" and citing video on YouTube).

[16]  *See, e.g.*, Ex. 17, https://www.youtube.com/@jerrykowal1007.

trade shows and conferences and promoted its products in this District.[17]  Its website, for example, refers to its attendance at a Santa Clara conference on May 26, 2022: "Global technology brand OPPO will showcase its range of augmented reality (AR) products for the first time in North America at the upcoming Augmented World Expo USA 2022 in Santa Clara."[18]  As another example, OPPO's Chief Product Officer, Pete Lau, also promoted OPPO's attendance at the 2025 Game Developers Conference in San Francisco on X.[19]

33.    OPPO's activities also are sufficient to establish personal jurisdiction because OPPO directed its conduct and intended to cause harm in this State and District by misappropriating trade secrets that it knew that Apple had developed and maintained in this District.  Apple's Northern California offices are central to its global operations and are home to many of its engineering, research and development, and testing activities.

34.    As his messages on his Apple-issued iPhone indicate, Dr. Shi contacted his Apple colleagues in this District on June 4, 2025 to discuss their research over one-on-one meetings with the intent of subsequently disclosing that information to the OPPO Defendants.

35.    As just one example of intentionally misappropriating these trade secrets developed in California, on June 4, 2025, Dr. Shi specifically reached out to colleagues in Apple's offices throughout the Northern District for one-on-one meetings to discuss their research and development efforts and to collect information for use in connection with his employment with the OPPO Defendants.

36.    Alternatively, this Court has personal jurisdiction over OPPO under Federal Rule of Civil Procedure 4(k)(2) because OPPO is not subject to general personal jurisdiction in any state court and has sufficient minimum contacts with the U.S. as a whole due to its substantial business in this country. OPPO has sufficient minimum contacts with the United States under Rule 4(k)(2) because, for example, the misappropriated trade secrets in this case belong to Apple, and OPPO hired former Apple employee, Dr. Shi, who worked on the products containing Apple trade secrets as a full-time employee in Apple's California office.  Additionally, OPPO maintains an English website, has employees in the United

---

[17]  Ex. 18, https://www.oppo.com/en.

[18]  *See* Ex. 19, https://www.oppo.com/en/newsroom/press/oppo-showcases-xr-technology-at-augmented-world-expo/.

[19]  *See* Ex. 20, https://x.com/PeteLau/status/1902981637690073181.

States, and its high-level employees, including Mr. Pete Lau, SVP and CPO of OPPO, promote OPPO products on their LinkedIn pages and attend various trade shows in the United States.

## VENUE

37.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this District, and also because a substantial part of the events or omissions giving rise to the claim occurred in this District.  Specifically, Apple is headquartered in this District, in Cupertino, California.  The trade secrets at issue in this case are owned by Apple in this District and developed in and managed at Apple's offices in this District.  Additionally, Dr. Shi was employed at Apple in this District and accessed and obtained the trade secrets at issue while working at Apple in this District.  Moreover, the actual economic, competitive, and other harm to Apple has occurred in this District, as the OPPO Defendants misappropriated Apple's trade secrets in this District, and their acquisition, possession and use of those trade secrets during their employment of Dr. Shi occurred in this District, as alleged herein.

38.    Venue is also proper under 28 U.S.C. § 1391(b)(3), including because OPPO, InnoPeak, and Dr. Shi are subject to personal jurisdiction in this District as set forth above.  Based on the allegations set forth herein, it was wholly foreseeable that OPPO, InnoPeak, and Dr. Shi would be subject to suit in this District.

39.    Venue is also proper in this Court as to Dr. Shi under the venue selection clause of the IPA between Dr. Shi and Apple.  The IPA expressly provides that Dr. Shi consents to venue in this District.  Under the terms of the IPA, Dr. Shi consented "to the personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California" and agreed that "any judicial action between the parties relating to this Agreement will take place in Santa Clara County, California."[20]

## DIVISIONAL ASSIGNMENT

40.    This is an action for trade secret misappropriation and breach of contract, where a substantial part of the events or omissions which give rise to the claims have taken place in and a substantial part of the property that is subject to the action is situated in Santa Clara County, and Apple

---

[20]    Ex. 2, Apple Confidentiality and Intellectual Property Agreement (executed by Shi on September 10, 2019) § VI ("General Provisions").

and Dr. Shi's IPA expressly states that, "any judicial action between the parties relating to this Agreement will take place in Santa Clara County, California[.]"  Thus pursuant to Civil Local Rule 3-2, this case should be assigned to the San Jose Division.

## BACKGROUND

### A.    Apple's Trade Secret Technologies are Critical to its Business and Success

41.    Apple is a global technology company recognized for its innovative consumer electronics products.  Since its founding in 1976, Apple has introduced transformative products like the Macintosh, iPhone, iPad, Apple Watch, and AirPods.  Apple is known for its seamless integration of hardware and software in a unified, proprietary ecosystem.  With a strong focus on design, performance, and privacy, Apple continuously advances the frontiers of technology, and it does so by its significant investments in research and development.

42.    Apple's release of its first-generation Apple Watch in 2015 set a new standard for smartwatches, distinguishing itself not only with its robust health and fitness tracking features but also with its sleek, customizable design and its seamless integration across the Apple ecosystem.  Since then, Apple has remained at the forefront, consistently setting the standard for innovation in health sensing technology.  Apple has continuously introduced critical innovations in relation to its Apple Watch technologies, including cutting-edge improvements involving hardware and software.

43.    Apple's health sensor technologies include groundbreaking health features designed to support a wide range of everyday users.  Specifically, Apple Watch is equipped with a sophisticated collection of sensors that form the foundation of its advanced health and wellness features, along with other critical hardware and software technologies.  These sensors are integrated throughout the device, including on the underside of the watch, the small, rotatable dial on the side of the watch, and inside the case of the watch.  The underside of the watch contains sensor technology that measures heart rate and blood oxygen levels using green, red, and infrared light and a wrist temperature sensor.[21]  The underside of the watch and the rotatable dial on the side of the watch also have electrodes that allow Apple Watch to measure electrical signals from the heart.  Inside the watch, other sensor technology such an

---

[21]    *See* Ex. 21, https://support.apple.com/en-us/102674.

accelerometer, gyroscope, and barometer measure parameters such as pressure, motion, and orientation. Additionally, Apple has developed other critical hardware and software technologies which, together with its sensors, allow Apple watch to monitor cardiovascular health, respiratory status, and overall wellness.

44.     One example of Apple's notable health-related innovations made possible by its health sensor technology in Apple Watch is its ability to generate an electrocardiogram (ECG or EKG), a test that records the timing and strength of the electrical signals that make the heartbeat.[22]  This feature received De Novo classification from the FDA in 2018 and allows users to take a single-lead ECG directly from their wrists using Apple Watch's ECG app.  The device records the timing and strength of the electrical signals and displays and records the waveform in the Health App on the iPhone or iPad.[23] This allows users to capture symptoms such as irregular heart rhythms or signs of atrial fibrillation, which can then be shared with healthcare providers for further evaluation.[24]  Since it first released its embedded ECG feature, Apple has continued to expand Apple Watch's functionality to provide deeper insights into cardiac health.  This includes the introduction of its FDA-cleared AFib History Feature in 2022.

45.     Apple's global leadership in this sophisticated technical field is the result of Apple's major commitments to, and investments in, technological innovation.  Apple has over 90,000 employees in the United States, and more in various countries throughout the world, and has spent billions of dollars to research new technologies and develop a wide range of consumer electronic products. Apple's substantial investments in research and other forms of innovation deserve protection, and Apple relies on its trade secrets, in addition to its copyrights, patents, and trademarks, to guard the ingenuity and industry of its employees.  Apple's innovative health sensing technology is a key area of its cutting-edge technologies and product design.  Health sensing technology uses small sensors to collect, process, and transmit data related to the wearer's physiological signals, movements, and environment.  This

---

[22]  *See* Ex. 22, https://support.apple.com/en-us/120278.

[23]  *See* Ex. 22, https://support.apple.com/en-us/120278.

[24]  *See* Ex. 23, https://www.apple.com/healthcare/docs/site/Apple_ECG_app_during_COVID-19.pdf (indicating use of ECG app during the COVID-19 pandemic).

allows monitoring of metrics such as heart rate, temperature, blood oxygen, sleep patterns, and more—creating actionable insights into health, fitness, and well-being.

46.     Apple's health sensing technology has set industry benchmarks for quality and performance.  For example, Apple Watch's Atrial Fibrillation (AFib) History Feature was the first digital health technology tool to qualify under the FDA's Medical Device Development Tool (MDDT) program.[25]  Apple Watch and iPhone work in tandem with Apple's Health app, which aggregates data from user sensors for a convenient, comprehensive view of their health, fitness, and wellness trends.[26]

47.     Apple's products incorporating health sensing technologies have been widely recognized as groundbreaking.  For example, Apple Watch has received numerous accolades, including being named a *Time* magazine "Best Invention."[27]  Similarly, Apple Watch and AirPods, as well as the iPad, were named by *Time* as some of "The 10 Best Gadgets of the 2010s."[28]  Newer models of Apple Watch, AirPods, and other Apple products continue to earn customer trust and critical acclaim.[29]

48.     Apple maintains many aspects of its wearable health sensing technology as confidential to protect the substantial investment Apple makes to develop them and Apple's competitive advantages in the marketplace.  Apple designs its own products, optimizing product components—such as sensor architecture and signal processing algorithms—for each product to perform consistently across millions of devices.  To that end, Apple has developed proprietary specifications, product development and testing processes, product plans, technology assessments, and other confidential information that ensure Apple's ability to produce and bring to market products that consistently include new, groundbreaking features and capabilities.  This confidential information derives considerable value from not being publicly known outside of Apple, because it represents a significant investment of time and money that provides Apple competitive advantages, among other things, from both a technological and business

---

[25]  *See, e.g.*, Ex. 24, https://www.fda.gov/medical-devices/medical-device-development-tools-mddt

[26]  Ex. 25, https://www.apple.com/health/.

[27]  Ex. 26, https://time.com/collection/best-inventions-2023/6324040/apple-watch-ultra-2/; Ex. 27, https://time.com/3594971/the-25-best-inventions-of-2014/.

[28]  Ex. 28, https://time.com/5745302/best-gadgets-of-the-2010s-decade/.

[29]  *See, e.g.*, Ex. 29, https://www.cnet.com/tech/mobile/apple-watch-10-years-later-the-one-feature-that-changed-everything-for-me/

perspective.

49.     Apple generates and owns trade secrets related to its health sensing technologies.  Dr. Shi's IPA sets out examples of information that Apple considers to be proprietary and trade secret.[30]

50.     Apple has invested a significant amount of time and resources into the proprietary technologies and related materials it has generated for its health sensing technologies.  This includes the Apple confidential information and trade secrets that Dr. Shi transferred to an external storage device in the days after he had announced his resignation from Apple and took with him after his employment, such as: (1) confidential schematics and technical specifications concerning hardware and software implementations of sensors and related technologies on Apple products, including temperature sensors, ECG functionality, and PPG sensors on Apple Watch; (2) confidential materials relating to technological capabilities in unreleased products and features; (3) confidential documents relating to temperature sensing technology, including technical parameters and design elements; (4) Apple's confidential Silicon Engineering Group documents on chip-related technologies, including silicon technologies; and (5) Apple-confidential information concerning engineering innovation, research, methodologies, and techniques.

51.     The Apple trade secrets that Dr. Shi illicitly downloaded and took with him to share with the OPPO Defendants are the result of years of technological innovation and business acumen.  Apple keeps these trade secrets strictly confidential.  In addition, these trade secrets are critical to Apple's success in the marketplace, including as a result of their secret and proprietary nature.  Apple's efforts and investments to develop these materials over the years have materially contributed to Apple's position as a market leader in health sensing technologies.  For these reasons, the trade secret materials taken by Dr. Shi, for use by the OPPO Defendants, are highly valuable assets belonging to Apple.

**B.     Apple Diligently Protects Its Trade Secret Information**

52.     Apple takes extensive measures to protect the secrecy of its trade secrets, including those at issue in this action.  Apple has acted reasonably and diligently to protect such information.  These measures include requiring employees to sign a Confidentiality and Intellectual Property Agreement

---

[30]     Ex. 2, Apple Confidentiality and Intellectual Property Agreement (executed by Dr. Shi on September 10, 2019) § I ("Confidential and Proprietary Information").

("IPA") which details the confidentiality and non-disclosure obligations of Apple's employees; requiring departing employees to complete exit procedures that reaffirm their obligations and remind them to return any Apple proprietary information before leaving Apple; using database exchange and collaboration systems which include permission assignment, to ensure access is on a need-to-know basis; requiring non-disclosure and/or confidentiality agreements with Apple's suppliers, vendors, contractors, and other third-parties before providing access to Apple's trade secrets, and even then only providing access to confidential information on a need-to-know basis; and maintaining high standards for encryption, password protection, and device authentication, among many other measures. Apple uses locked buildings, security cameras, guards, and other measures to control access to its physical facilities. Apple restricts physical access to its buildings within the company—badge access for Apple employees may be limited to certain buildings or portions of buildings depending on the employee's specific team and role, including where the trade secrets Dr. Shi misappropriated are used. Any person who does not have a badge must be escorted by an Apple employee while within Apple's facilities.

53.    Apple further protects its trade secrets by restricting access to its file repositories for projects to only those employees who are currently working on and authorized to view them. Apple strictly controls who is disclosed on a project and only permits individuals with a demonstrated business need to be disclosed.

54.    With respect to employee confidentiality agreements, Apple's IPA legally obligates Apple employees to protect and not disclose Apple's confidential information to unauthorized third parties and is clear that this obligation continues after an employee leaves Apple.

55.    For example, under Apple's IPA, which Dr. Shi signed, employees attest that:

You understand and agree that your employment by Apple prohibits you, during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple. You understand and agree to strictly comply with all of Apple's rules and policies regarding Proprietary Information and use best efforts to safeguard such Proprietary Information and protect it against disclosure, misuse, loss, or theft. Upon termination of employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies

thereof, whether on paper or any other medium, containing any Proprietary Information.[31]

56.     All Apple employees are required to sign the IPA, and Dr. Shi signed a copy of the IPA on September 10, 2019.[32]

57.     Apple ensures its employees understand their obligations by providing trainings addressing their confidentiality obligations.  For instance, Apple requires all its employees to take a "Business Conduct" course annually.  In the Business Conduct course, Apple informs its employees that they must keep trade secrets strictly confidential.  Dr. Shi took this Business Conduct course in 2020 and every year through 2024.

58.     Apple also follows standard departure procedures to protect its confidential information. Departing employees must return Apple devices, including laptops and mobile devices, as well as their badges and other Apple-owned equipment.

59.     When departing Apple, employees are reminded that their confidentiality obligations remain even after termination.  For example, Apple's Departing Employee Exit Interview instructions for managers state:

> Remind them that they are expected to abide by the provisions of their Intellectual Property Agreement (IPA) after their employment with Apple ends.  Give specific examples of Apple IP they have been exposed to, including but not limited to, unreleased product information, schedules, budgets, marketing plans, organization charts, customer lists, and vendor contacts.  Use the Exit Interview Script to address additional topics that may put IP at risk.

60.     Apple conducted an exit interview with Dr. Shi on June 26, 2025.  Apple reminded Dr. Shi of his lasting obligation to keep his work at Apple confidential and to return all Apple data and property, and Dr. Shi did not inform Apple of his transfers of Apple files to an external drive and other unauthorized locations.  Additionally, on June 23, 2025, Dr. Shi confirmed through Apple's "Confidentiality Reminder" that he understood his obligations under the IPA.

61.     Due to Apple's security measures, Apple's trade secrets, including those that the OPPO

---

[31]   Ex. 2, Apple Confidentiality and Intellectual Property Agreement (executed by Shi) § I.A ("Treatment of Proprietary Information").

[32]   Ex. 2, Apple Confidentiality and Intellectual Property Agreement (executed by Shi) § I.A ("Treatment of Proprietary Information").

Defendants misappropriated, are not available to the public or to Apple's competitors through any legitimate means.

### C.     The OPPO Defendants Recognized the Value in Apple's Trade Secrets

62.     OPPO is a Chinese electronics company founded in 2004 that sells smartphones and other electronic devices.  While OPPO does not purport to sell products in the United States under its own name, it operates a "research center" in the heart of Silicon Valley out of the same office as its related company InnoPeak Technology.  OPPO, like Apple, offers smartwatch products, but has generally trailed Apple Watch.  By the time OPPO introduced its first smartwatch in 2020,[33] Apple Watch had already been established as a leading solution for a wide variety of tasks, including health monitoring.  Industry media outlets recognize that the OPPO Defendants' smartwatches are strikingly similar to Apple Watch.[34]

63.     In 2025, amidst the continued success of Apple's cutting-edge Apple Watch technology, the OPPO Defendants had an opportunity to gain unauthorized access to Apple trade secrets—namely, by hiring an Apple employee who had substantial access to Apple's proprietary technologies.

64.     In his role at Apple from January 2020 until his departure in June 2025, Dr. Shi had a front row seat to Apple's development of its cutting-edge health sensor technology, including highly confidential roadmaps, design and development documents, and specifications for ECG sensor technology.  While Dr. Shi could take his general knowledge (which already is extremely valuable) to the OPPO Defendants without issue, that was not enough for them or Dr. Shi.  In the weeks prior to his resignation from Apple (and unbeknownst to Apple), Dr. Shi communicated with OPPO about his plans to "share with" OPPO the internal materials and information he had gathered from Apple.  That

---

[33]    Ex. 30, https://www.businessinsider.com/oppo-watch-vs-apple-watch-similarities-pictures-2020-3.

[34]    *E.g.* Ex. 31, (https://www.cnet.com/tech/mobile/oppo-watch-copies-apple-watchs-design-to-offer-android-alternative/) ("Oppo Watch copies Apple Watch's design to offer an Android alternative"); Ex. 30 (https://www.businessinsider.com/oppo-watch-vs-apple-watch-similarities-pictures-2020-3) ("Chinese smartphone maker Oppo is set to release its first smartwatch – and it looks exactly like an Apple Watch"); Ex. 32 (https://www.theverge.com/2020/5/22/21267264/oppo-watch-hands-on-preview-smartwatch-china-apple) ("But come on, there is no universe in which this product looks like this without the Apple Watch coming before it.  From the strap design to the shape of the screen to the visual style of the OS, this is plainly a product that's been made in Apple's shadow."); Ex. 33 (https://www.oppo.com/en/audio/).

information included a wide variety of cutting-edge technologies, such as health sensing technologies used in Apple Watch. Critically, many of the documents that Dr. Shi unlawfully exfiltrated describe Apple's specific technology implementations, and other highly detailed technical and development information. These documents provide an unlawfully obtained guide to Apple's past and current products, as well as unreleased features in development by Apple.

**D.     The OPPO Defendants' Leadership Communicated In Secret With Dr. Shi About His Plans To Exfiltrate Apple Trade Secrets Before Dr. Shi Left Apple**

65.     Apple's inspection of Dr. Shi's Apple-issued work devices revealed his communications with senior leadership at the OPPO Defendants. Specifically, the Vice President and Head of OPPO Health, Dr. Zijing Zeng, confirmed Dr. Shi's friend request on April 15, 2025, and spoke to Dr. Shi on the same day. At all relevant times, the OPPO Defendants were aware that Dr. Shi was employed by Apple, and of the nature of his work and responsibilities as an Apple employee. As the messages demonstrate, OPPO encouraged, approved, and agreed to Dr. Shi's plan to collect Apple's proprietary information before leaving Apple.

66.     The messages between Dr. Zeng and Dr. Shi further discuss the possibility of working together. They exchanged dozens of messages over the next two months and had several calls. On May 17, 2025, Dr. Zeng advised Dr. Shi that OPPO would likely have an opening in May.

67.     Right after advising Dr. Shi that there was an opening, Dr. Zeng asked Dr. Shi about "PPG," which is a health sensor technology that uses light to measure changes in blood volume, which provides information such as heart rate and blood oxygenation, and is critical to smartwatches like those Apple and the OPPO Defendants sell:

> [original message in Chinese]
>
> "你对 PPG 了解吗光学的一些 sensing technology 也蛮重要的,"
>
> [English translation of message]
>
> "Are you familiar with PPG? Some optical sensing technologies are also quite important."

68.     Dr. Shi replied:

[original message in Chinese]

"嗯嗯 PPG 的原理以及光学相关知识都是了解的 我目前负责热学 我们大组负责 PPG 我去尽量多学习下，"

[English translation of message]

"Yes, I understand the principles of PPG and related optical knowledge. I'm currently in charge of thermal systems, and our larger team is responsible for PPG.  I'll make my best effort to learn as much about it as possible."

69.    Thus, Dr. Shi acknowledged that he did not have a detailed background on PPG sensors but clarified that others on his Apple team—"our larger team"— did.  He further advised Dr. Zeng that he was going to "learn as much about it as possible" from that Apple team, i.e., learn about PPG by studying Apple's confidential information.  After Dr. Shi confirmed that he was going to obtain Apple confidential information about PPG sensors, Dr. Zeng responded with two "awesome" emojis.  The next day, Dr. Zeng confirmed he provided Dr. Shi's information to HR.

70.    By May 14, 2025, Dr. Shi advised Dr. Zeng that he had "decided to join" the OPPO Defendants and was "thinking about what [he could] contribute to the team once [he] join[s]."

71.    Dr. Shi then requested a large salary from the OPPO Defendants that was initially rejected by a recruiting manager as too high.  The manager advised that his salary would likely be half of what Dr. Shi sought.  With Dr. Zeng's assistance, the manager confirmed that the OPPO Defendants would meet Dr. Shi's salary demand "as long as we can ensure a long-term cooperation."  Dr. Shi responded to the manager stating, "Alright, no problem.  I'm quite satisfied with this offer," "[p]lease also help me thank Zijing for his support" and that he "intend[s] to cooperate with OPPO for the long term and ha[s] many ideas that I want to realize together with the team."

72.    The following week, having successfully negotiated his salary and promised his long-term support to the OPPO Defendants, Dr. Shi advised Dr. Zeng that he was "reviewing various internal materials and doing a lot of 1:1 meetings in an effort to collect as much information as possible" and that he would "share with you all," i.e., the OPPO Defendants, "later."  Dr. Shi did as promised, and set up and participated in numerous one-on-one meetings with other Apple engineers to get their "vision on health sensing and seek suggestions on career growth."  In fact, there was a noticeable increase in Dr. Shi's scheduled one-on-one meetings starting around the time that Dr. Shi started discussions with Dr.

Zeng, culminating with 33 one-on-one meetings in June 2025, compared with an average of seven one-on-one meetings per month earlier in the year.

73.    These meetings were in furtherance of Defendants' illegal and improper scheme.  Dr. Shi secured and held these meetings on behalf of and with approval from the OPPO Defendants and under false pretenses of future collaboration with his Apple team and the other engineers—for example, seeking out information from one Health Technologies engineer by claiming he was interested in switching into a role on his team—when in fact, Dr. Shi knew that he was departing Apple imminently for the OPPO Defendants.  Dr. Shi had no legitimate business purpose for arranging these meetings, which covered projects that Dr. Shi was not involved with at Apple, including about future technologies beyond the scope of Dr. Shi's role.

74.    Dr. Shi signed his offer with the OPPO Defendants for a job at the U.S. Research Center on June 7, 2025, and planned to start on June 30.  He also planned to meet with Dr. Zeng at OPPO's US Research Center his first week there.

75.    At no point in his discussions with Dr. Shi, including those referring to gathering Apple "internal materials" or other confidential information from one-on-one meetings, did Dr. Zeng ever discourage Dr. Shi from engaging in such conduct.  To the contrary, as the messages above make clear, Dr. Zeng assented to Dr. Shi's efforts to gather "as much information as possible" from Apple, referring to Dr. Shi's efforts— done to benefit and on behalf of both Dr. Shi and his new employer, the OPPO Defendants— as "awesome."  Throughout these discussions, Dr. Shi repeatedly confirmed his understanding that he was working *for* and *with* the OPPO Defendants, calling the OPPO products "*our* ring/watch products," noting that "everyone wants to make *our* product better," and referring to the OPPO Defendants' Bay Area office as "*our* U.S. research center."  Dr. Shi's conduct was exactly in line with the OPPO Defendants' expectations for the contributions he would make.  As illustrated above, the OPPO Defendants induced Dr. Shi to violate his confidentiality obligations to Apple.  Further, as explained below, Dr. Shi did in fact violate his confidentiality obligations to Apple by the acquisition of Apple's trade secrets for the benefit of the OPPO Defendants, whose products overlap with those Dr. Shi worked on at Apple.

**E.    Dr. Shi Transferred Apple Trade Secrets For Himself and His New Employers, The OPPO Defendants, Before He Left Apple**

76.    On June 5, 2025, Dr. Shi informed his manager that he was resigning from Apple, and Dr. Shi's last day of work was set for June 27, 2025.  Dr. Shi claimed that he was planning to take time off to care for his aging parents, and that he was currently not looking for work.  On June 20, 2025, Dr. Shi submitted his formal letter of resignation to his manager.  In the letter, Dr. Shi stated he was resigning from his position "due to personal and family reasons."  Dr. Shi did not reveal that he had a position with the OPPO Defendants at their "US research center," or that he had been and was continuing to collect trade secrets from Apple for the OPPO Defendants' use.

77.    Unbeknownst to Apple, in his final days at Apple, Dr. Shi, on behalf of the OPPO Defendants, downloaded Apple confidential, proprietary materials, and transferred them to an external USB hard drive at the inducement of, in furtherance of his job responsibilities and within the scope of his new employment with the OPPO Defendants that he had been working for months to secure.

78.    Apple maintains secure Box locations as shared drives, which only permits access to files at those locations by authorized users.  A review of Dr. Shi's Apple secure Box downloading activity reveals that on Monday, June 23, 2025, starting at approximately 9:51 PM PDT and through 12:37 AM PDT on Tuesday, June 24, 2025, Dr. Shi downloaded approximately 63 files from Apple's internal shared file site at Box, including from a folder about health sensing technology, to his Apple-issued MacBook.  Dr. Shi placed certain of these downloaded files in a folder labeled, 苹果相关 ("Apple Related").

79.    A review of Dr. Shi's Apple secure Box downloading activity also reveals that Dr. Shi's downloading activity in June 2025 was more extensive than usual.  In fact, between June 5 and June 26, 2025, Dr. Shi downloaded approximately the same number of files as he had for all of January through May 2025.

80.    The "Apple Related"—or 苹果相关—folder into which Dr. Shi stored certain Box downloads includes many Apple trade secret and confidential files, which Dr. Shi further organized into sub-folders that indicated the type of documents contained within that folder.  For example:

- A trade secret and confidential document in the Health Sensing/Temperature subfolder with a file

path ending with "background for Sumant.pdf." This document concerns a confidential Apple project that is not publicly disclosed or known. This file concerns confidential information including technical details about the project and product roadmap.

- A trade secret and confidential document in the Health Sensing/Temperature subfolder, with a file path ending with "Sensor Introduction.key." This document concerns a confidential Apple project that is not publicly disclosed or known. This file includes closely-held technical details about the project that Apple is evaluating for future release.

- A trade secret and confidential document in the Health Sensing/Temperature subfolder with a file path ending with "Mittigaton Update 2-24-2023.pdf." This file includes technical information related to sensors in Apple's products.

- A trade secret and confidential document in the Health Sensing/Temperature subfolder with a file path ending with "Filtering Deep Dive.pdf." This file concerns confidential information including algorithms that Apple developed.

- A trade secret and confidential document in the Health Sensing/PPG subfolder with a file path ending with "V1.docx." This file includes information relating to Apple's PPG sensor, including extensive research and development work by Apple to incorporate that sensor into the Apple Watch.

- A trade secret and confidential document in the Health Sensing subfolder with a file path ending with "Health Sensing All Hands 2025 02 05 and 2025 02 13.pdf." This document includes technical information about Apple's sensors and Apple's product roadmaps.

- A trade secret and confidential document in the SEG Tech Talks subfolder with a file path ending in "Silicon" and "082319.key" from Apple's Silicon Engineering Group ("SEG"), which develops Apple's custom chips. This document includes technical information developed by Apple engineers.

- A trade secret and confidential document in the Modeling Conference subfolder with a file path ending in "5328.pdf." This document includes information about methodologies and techniques relevant to Apple products.

- A trade secret and confidential document in the Modeling Conference subfolder with a file path ending in "5167.pdf." This document includes information about methodologies and techniques relevant to Apple products.

- A trade secret and confidential document in the Modeling Conference subfolder with a file path ending in "5133.pdf." This document includes information about methodologies and techniques relevant to Apple products.

81.    Approximately a day after his Box downloads, again after business hours, on June 25, 2025 at approximately 1:09 AM PDT, Dr. Shi copied the "Apple Related" folder to his USB hard drive. In addition to identifying the documents at the file paths below, the forensic examination revealed that the documents in the "Apple Related" folder on the USB hard drive had the same folder structure as the "Apple Related" folder on Dr. Shi's Apple-issued MacBook, which evidences his wholesale copying of that folder:

- File path starting with: "Volumes/New Volume/苹果相关/Health Sensing/Temperature" and ending in "Introduction.key."

- File path starting with "Volumes/New Volume/苹果相关/Health Sensing/ECG" and ending in "Intro - EPM.key."

82.    In an attempt to conceal his download and transfer activities, Dr. Shi deleted the "Apple Related" folder from his Apple-issued Macbook.  Dr. Shi's internet search history revealed that, on June 16, 2025, at 12:14 PM PDT, Dr. Shi searched, "how to wipe out macbook," and on June 23, 2025 at 9:59 PM PDT, the day before Dr. Shi connected the USB drive to his Apple-issued Macbook, Dr. Shi searched, **"**Can somebody see if I've opened a file on a shared drive?"

83.    Apple's secure Box storage is a shared drive, allowing access to files by authorized users. And when, as a matter of routine practice with departing employees, Apple asked Dr. Shi to confirm he was not departing with any Apple confidential information, Dr. Shi did not disclose the USB drive onto which he had transferred Apple's trade secrets and confidential information.

84.    Apple developed the trade secret files exfiltrated by Dr. Shi, for the benefit of the OPPO Defendants, through substantial effort of Apple employees.  These trade secrets are critical to Apple's success in the marketplace, including as a result of their secret and proprietary nature, given the competitive advantage that Apple has as a result of the technologies disclosed in these files.

85.    Dr. Shi left Apple without disclosing his illicit transfer of Apple's confidential, proprietary and trade secret materials for the benefit of the OPPO Defendants to the external drive.  To the contrary, on June 23, 2025, and on the day that Dr. Shi secretly downloaded Apple trade secrets from Box, Dr. Shi confirmed to Apple that he understood his obligations to protect Apple confidential information and that he understood that he must return all Apple confidential information prior to departing.  Dr. Shi has never returned the USB hard drive storing his unauthorized copies of Apple proprietary information.

## **FIRST CAUSE OF ACTION**

**Trade Secret Misappropriation Under The Defend Trade Secrets Act, 18 U.S.C. §§ 1836, 1837, 1839 et seq.**

**(Against InnoPeak and OPPO)**

86.    Apple incorporates and re-alleges every allegation above as though fully set forth herein.

87.    Apple is the owner of certain valuable trade secrets in and relating to its health sensing

technology including unreleased feature specifications, design, and development information and plans for Apple's future and unreleased products, as those trade secrets are specifically described above. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Apple, and Apple has spent significant time and money developing such confidential information and trade secrets. These trade secrets and confidential information, as described above, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

88.     The above detailed confidential trade secrets that the OPPO Defendants acquired, accessed, disclosed, and used derive independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means to other persons or entities who might obtain economic value from their disclosure or use. Resulting from years of research and development at substantial cost to Apple, these trade secrets are foundational to Apple's competitive advantages in health sensing technology and in the larger consumer devices market.

89.     At all times relevant herein, Apple has taken the above-described reasonable measures to protect the secrecy of its trade secret and confidential information, including that which OPPO Defendants have misappropriated, including by requiring confidentiality agreements to be signed by any party granted access to Apple's trade secrets and the other measures described above.

90.     Apple also makes significant investments in advertising and promotional activities surrounding the launch of a new product. Unauthorized disclosures of unannounced products cause Apple to lose control over the timing and nature of potential product releases. Unauthorized disclosures diminish the interest of both the mainstream and trade media in the launch of a new product. Such disclosures may also dampen customer demand for current products. Thus, Apple maintains and protects such information as a trade secret.

91.     Apple afforded Dr. Shi access to and use of Apple's confidential information and trade secrets in connection with his work at Apple. Dr. Shi had a duty to maintain this information as confidential under the terms of his IPA with Apple, in which he expressly acknowledged and confirmed the confidential nature of these secrets.

92.     As stated above, Apple's trade secret and confidential information relates to products used, sold, purchased, or transported, or intended for use, sale, purchase, or transport across the United

States and throughout the world.  The OPPO Defendants, through Dr. Shi's access while he was employed at Apple, acquired, accessed, and used Apple's trade secrets and confidential information by improper means, without Apple's express or implied consent, and in violation of Dr. Shi's IPA described above.

93.    The OPPO Defendants actually misappropriated Apple's trade secrets and confidential information to benefit themselves, and to allow the OPPO Defendants to unfairly compete against and harm Apple by acquiring and using Apple's trade secrets, including in this District.  The OPPO Defendants improperly acquired Apple's trade secrets.  Misappropriation of this type of information undermines Apple's competitive position in the market for these offerings.

94.    The OPPO Defendants knew or had reason to know at the time they acquired, accessed, and used Apple's trade secret and confidential information that this information is confidential and was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, including by virtue of the IPA.  Defendants further knew or had reason to know that this information was developed or acquired by Apple at great expense and effort.  The OPPO Defendants further knew or had reason to know that Apple maintains this information as confidential and this information is not generally available to the public or Apple's competitors such that having this information would provide significant benefit to an outside party.

95.    The OPPO Defendants also improperly acquired and participated in the use of Apple's trade secrets, including by virtue of Dr. Shi's transfer of confidential Apple information to a secret USB hard drive for use in connection with and to benefit Dr. Shi's work with the OPPO Defendants, and their inducement of Dr. Shi to do so in violation of his confidentiality obligations to Apple.  Further, Dr. Shi has used and disclosed Apple's trade secrets within the course and scope of his employment with the OPPO Defendants and for their benefit.

96.    Further, Dr. Shi's download and transfer of Apple's trade secrets to the secret USB hard drive occurred after he accepted employment with the OPPO Defendants, with approval of the OPPO Defendants, and within the scope of his employment with the OPPO Defendants, and, in doing so, Dr. Shi was acting on the OPPO Defendants' behalf at the OPPO Defendants' instruction, was subject to the OPPO Defendants' control, and consented to do so.  Dr. Shi's unlawful actions, including transferring

Apple's trade secret information to the USB hard drive, and using such information in his role with the OPPO Defendants, occurred within the scope of his employment with the OPPO Defendants and was, at least in part, for the benefit of the OPPO Defendants to give the OPPO Defendants an unfair advantage against Apple. The OPPO Defendants are therefore at least vicariously liable for Dr. Shi's actions, in addition to being directly liable for their own improper acquisition, use, and disclosure of Apple's trade secrets as alleged herein.

97.    At no time has Apple consented to the OPPO Defendants' improper acquisition, disclosure, or use of Apple's trade secrets for any reasons unrelated to Dr. Shi's employment with Apple.

98.    Thus, the OPPO Defendants have engaged in the actual and threatened misappropriation of Apple's trade secrets in violation of the DTSA.

99.    The OPPO Defendants' actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. 1839(5).

100.    The OPPO Defendants are retaining and using Apple's trade secret and confidential information to compete with and/or otherwise harm Apple. As alleged herein, the OPPO Defendants committed acts in furtherance of their misappropriation in the United States and in this District, including misappropriation of trade secrets that they obtained and/or originated from this District with knowledge and intent to harm Apple in this District.

101.    The OPPO Defendants' misappropriation has proximately caused damage to Apple, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities—for which Apple is seeking damages.

102.    The OPPO Defendants have been unjustly enriched as a further proximate result of their misappropriation of Apple's trade secret and confidential information—for which Apple also is seeking damages.

103.    The OPPO Defendants' actions in misappropriating Apple's trade secret and confidential information were willful, fraudulent, malicious, and were done with the intent to injure and oppress Apple and improve their own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to 18 U.S.C. 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C.

1836(b)(3)(D).

104.    Apple is also entitled to injunctive relief to protect its confidential information and trade secrets by (1) enjoining the OPPO Defendants from further possessing, using or disclosing Apple's trade secret and confidential information; (2) enjoining the OPPO Defendants from altering or deleting Apple's trade secret and confidential information, or any related evidence; and (3) requiring the OPPO Defendants to turn over any and all copies of Apple's trade secret and confidential information to Apple.

### SECOND CAUSE OF ACTION
**Breach of Contract**
**(Against Dr. Shi)**

105.    Apple incorporates and re-alleges every allegation above as though fully set forth herein.

106.    Dr. Shi voluntarily entered the IPA with Apple.  *See* Ex. 2.

107.    The IPA is a valid, binding, and enforceable contract.

108.    Under the terms of the IPA, Dr. Shi agreed to "promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple" and to "not take with you any documents, materials, or copies thereof . . . containing any Proprietary Information." *Id.*

109.    Under the terms of the IPA, Dr. Shi further agreed that he was prohibited "during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple." *Id.*

110.    Under the terms of the IPA, Dr. Shi further agreed to "strictly comply with all of Apple's rules and policies regarding Proprietary Information and use best efforts to safeguard such Proprietary Information and protect it against disclosure, misuse, loss, or theft." *Id.*

111.    On June 23, 2025, Apple reminded Dr. Shi of his obligations under the IPA and Dr. Shi confirmed through Apple's "Confidentiality Reminder" that he understood his obligations under the IPA.

112.    Dr. Shi materially breached the IPA by not holding Apple's proprietary information in confidence and by transferring, publishing, disclosing, or reporting Apple's proprietary information not generally known outside of Apple and using such information outside the course of performing his duties for Apple and other than for the sole benefit of Apple.

113.     Dr. Shi materially breached the IPA by transferring materials and property belonging to Apple, including by transferring Apple's trade secret documents to a personal external storage drive for his and the OPPO Defendants' ongoing possession and use.

114.     As a proximate result of Dr. Shi's actions, in concert with the OPPO Defendants, Apple has been damaged and is entitled to damages.

115.     Apple has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law Apple and is entitled to preliminary and/or permanent injunctive relief against further breaches of the IPA.

### **PRAYER FOR RELIEF**

116.     WHEREFORE, Apple prays for relief as follows:

(a)     Award judgment in favor of Apple and against the OPPO Defendants on Apple's trade secret misappropriation claim asserted in its Complaint;

(b)     Award judgment in favor of Apple and against Dr. Shi on Apple's breach of contract claim asserted in its Complaint;

(c)     Award a preliminary and/or permanent injunction prohibiting the OPPO Defendants and Dr. Shi, and all those acting on their behalf of or in active concert or participation with them, from possessing, using, or disclosing Apple's trade secrets;

(d)     Award a preliminary and/or permanent injunction restraining and enjoining the OPPO Defendants and Dr. Shi, and all those acting on their behalf or in active concert or participation with them, from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper electronic documents, including current or archived electronic logs, metadata, and directories;

(e)     Declare that the OPPO Defendants and Dr. Shi have no rights or privileges to use Apple's confidential information or trade secrets;

(f)     Award Apple restitution in an amount to be determined at trial;

(g)     Award Apple damages in an amount to be determined at trial;

(h)     Award Apple punitive and/or exemplary damages in an amount to be determined at trial;

(i)    Award Apple disgorgement of profits;

(j)    Award Apple pre-judgment and post-judgment interest;

(k)    Award Apple attorneys' fees and costs; and

(l)    Award Apple such other relief as the Court deems appropriate.

**<u>JURY DEMAND</u>**

117.    Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. P. 38, Apple requests trial by jury for all causes of action, claims, or issues in this action that are so triable.

1

2    DATED: August 21, 2025                Respectfully submitted,

3                                          KIRKLAND & ELLIS LLP

4
                                           */s/ Adam Alper*
5                                          Adam Alper (SBN: 196834)
                                           adam.alper@kirkland.com
6                                          Laura Vartain Horn (SBN: 258485)
                                           laura.vartain@kirkland.com
7                                          KIRKLAND & ELLIS LLP
                                           555 California Street
8                                          San Francisco, CA 94104
                                           Telephone:    (415) 439-1400
9                                          Facsimile:     (415) 439-1500

10                                         Michael W. De Vries (SBN: 211001)
                                           michael.devries@kirkland.com
11                                         KIRKLAND & ELLIS LLP
                                           695 Town Center Drive
12                                         Costa Mesa, CA 92626
                                           Telephone:    (714) 982-9922
13                                         Facsimile:     (714) 982-8844

14                                         Leslie M. Schmidt (*pro hac vice forthcoming*)
                                           leslie.schmidt@kirkland.com
15                                         KIRKLAND & ELLIS LLP
                                           601 Lexington Avenue
16                                         New York, NY 10022-4611
                                           Telephone:    (212) 446-4800
17                                         Facsimile:     (212) 446-4900

18                                         Maria M. Beltran (SBN: 327237)
                                           maria.beltran@kirkland.com
19                                         KIRKLAND & ELLIS LLP
                                           2049 Century Park East, Suite 3700
20                                         Los Angeles, CA 90067
                                           Telephone:    (310) 552-4200
21                                         Facsimile:     (310) 552-5900

22                                         *Attorneys for Plaintiff Apple Inc.*

23

24

25

26

27

28