**Pages 1 - 10, 61 - 101, and 137 - 165**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Eumi K. Lee, Judge

| | | |
|---|---|---|
| APPLE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. C 25-07105 EKL |
| | ) | |
| CHEN SHI, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

San Jose, California
Tuesday, March 10, 2026

**TRANSCRIPT OF PROCEEDINGS**

<u>**APPEARANCES**</u>:

For Plaintiff:

KIRKLAND & ELLIS LLP
695 Town Center Drive, Suite 1700
Costa Mesa, California 92626
BY:  **MICHAEL WOODROW DE VRIES, ESQ.**

KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, California 94104
BY:  **ADAM R. ALPER, ESQ.**

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
BY:  **LESLIE M. SCHMIDT, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:    James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                Official Court Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiff:
                        KIRKLAND & ELLIS LLP
                        2049 Century Park East, Suite 3700
                        Los Angeles, California 90067
                   BY:  **SARA ADINA STOHL, ESQ.**

For Defendant Guangdong Oppo Mobile Telecommunications, Corp.,
Ltd.:
                        STEPTOE LLP
                        1330 Connecticut Avenue, Northwest
                        Washington, DC 20036
                   BY:  **BOYD CLOERN, ESQ.**

                        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                        865 South Figueroa Street, 10th Floor
                        Los Angeles, California 90017
                   BY:  **PATRICK THOMAS SCHMIDT, ESQ.**

                        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                        50 California Street, 22nd Floor
                        San Francisco, California 94111
                   BY:  **VICTORIA BLOHM PARKER, ESQ.**

For Defendant Chen Shi:
                        LAW OFFICES OF ANNABEL H. CHANG APC
                        39116 Fremont Hub, Suite 1121
                        Fremont, California 94538
                   BY:  **ANNABEL HAYOUNG CHANG, ESQ.**

For Defendant InnoPeak Technology, Inc.:
                        KATZ RUBY & CARLE LLP
                        3420 Bristol Street, Suite 600
                        Costa Mesa, California 92626
                   BY:  **VICTOR H. YU, ESQ.**

For Defendant Zijing Zeng:
                        KEKER VAN NEST & PETERS LLP
                        633 Battery Street
                        San Francisco, California 94111
                   BY:  **ANDREW FREDERICK DAWSON, ESQ.**
                        **JILON LI, ESQ.**

**Tuesday - March 10, 2026**                                    **1:24 p.m.**

                         P R O C E E D I N G S

                              ---000---

            THE CLERK:  All rise.

       The United States District Court for the Northern District of California is back in session, the Honorable Eumi K. Lee presiding.

            THE COURT:  Please be seated.

            THE CLERK:  We are on today for a motion for preliminary injunction.  Our case is Case Number 5:25-CV-7105-EKL, Apple Inc. versus Shi, et al.

       Counsel, please come forward and state your appearances on the record, starting with counsel for the plaintiff.

            MR. DE VRIES:  Good afternoon, Your Honor.  My name is Mike De Vries.  I'm one of the lawyers who represents Apple in this proceeding.

       With me here today also to answer questions from Your Honor, if you have any, are my colleagues Adam Alper, Leslie Schmidt, and Adina Stohl.  And also here from Apple are Diek Van Nort, Julie Osborn, Meredith Angueira, and Jenny Liu.

            THE COURT:  Okay.  Good afternoon, everybody.

            ZOOM RECORDING:  Recording in progress.

            MR. CLOERN:  Good afternoon, Your Honor.

            THE COURT:  Good afternoon.

       It's good to see everyone in person.

**MR. CLOERN:**  It is.  It's good to be here.

I'm Boyd Cloern.  I am counsel for OPPO.  I'm from the Steptoe firm, and there's other counsel from other defendants here.  I will let them introduce themselves.

In the courtroom here is Ms. Crowther.  She is with us. Dr. Zeng is in the courtroom.  Von Qi is in the courtroom.  We have other representatives from OPPO here as well.

**THE COURT:**  Okay.

**MR. CLOERN:**  Thank you.

**THE COURT:**  Thank you.

**MR. SCHMIDT:**  Good afternoon, Your Honor.  My name is Patrick Schmidt.  I also represent the OPPO defendants, and I'm also joined by my colleague Vicki Partner -- Parker, who may answer some questions that Your Honor may have.  She's also with me.

**THE COURT:**  Okay.  Thank you.

**MR. YU:**  Good afternoon, Your Honor.  My name is Victor Yu, of Katz Ruby & Carle.  I represent Defendant InnoPeak.  I'm joined by my partner Michael Katz, who's sitting in the courtroom, and also by Richard Wahng and Dorothy Tan of InnoPeak.

**THE COURT:**  Okay.  Thank you.

**MR. DAWSON:**  Good afternoon, Your Honor.  My name is Andrew Dawson, of Keker Van Nest & Peters.  I represent Dr. Zeng in this proceeding, and I'm joined today by my

colleague, JiLon Li, who's sitting in the gallery.

THE COURT:  Okay.  Thank you.

MR. DAWSON:  Thank you.

MS. CHANG:  Good afternoon, Your Honor.  Annabel Chang for Defendant Dr. Chen Shi.

THE COURT:  All right.  Good afternoon.

Thank you for your patience as we got everything up and going.  And thank you, everybody, for your flexibility in terms of helping out with technical support today.

So, as mentioned, we're here today on the motion for preliminary injunction brought by Apple.  We met last week trying to -- trying to figure out the game plan, so to speak, given the extent and breadth of the information that had been marked confidential and for attorney eyes only.

So I'd asked parties to continue to meet and confer regarding a game plan for today.  I want to check and see how we're doing before we begin.

Yes, Mr. De Vries.

MR. DE VRIES:  Yes, Your Honor.  Thank you.

So the parties did confer, and I understand that an agreement has been reached.  And essentially, the -- Apple -- subject, of course, to whatever would be most helpful to Your Honor in terms of us ask- -- answering questions that are on your mind and addressing the issues that Your Honor is most interested in.

Subject to that, of course, Apple has a presentation that we're prepared to give.  The first part of that presentation is Apple-confidential, meaning that it should be under seal, and everyone who's not associated with Apple should not be present.  And then there's a second half of our presentation that is public, where it can be open.

And so we've put into one part of the presentation everything that would be Apple-confidential.  Of course, if there are questions that arise on the fly from Your Honor, in order to answer those during the public court -- part of the proceeding, we'll be cognizant of that and make sure to raise that so we can handle that at the appropriate time.

**THE COURT:**  Is the way it's -- it's sequenced to start with the confidential portion?

**MR. DE VRIES:**  It is, yes, Your Honor.

**THE COURT:**  Okay.  Okay.

**MR. CLOERN:**  So, Your Honor, Apple will do their presentation, and then defendants will begin their presentation first with OPPO, and we will begin with our open part.  So they'll start with the closed and then move to open.

We'll do an open part.  That will start with me.  I'll be addressing irreparable harm and balance of the hardships, and Mr. Schmidt will talk about likelihood of success.  And that's where the technical stuff, for lack of a better term, will go.

**THE COURT:**  Uh-huh.

MR. CLOERN:  And -- and --

THE COURT:  And that's closed?

MR. CLOERN:  And that will be the closed portion, Your Honor, and we've cabined everything to there.

And then after that, we'll have short presentations from InnoPeak, Dr. Shi, and Dr. Zeng.  And that will all be open.

THE COURT:  Okay.  All right.  Well, that makes good sense to me to sort of ground me in terms of technology first and then moving to the open portion.  I hope that everybody is okay and patient for us having to get up and -- up and down because we also have members of the public present as well.

So -- so, with that, I am fine with that.  You will cue me.  I will probably be a little bit short in my questions in terms of the open portion just to make sure we don't step into the confidential portion.  I probably would be more active in my questioning for the confidential portions.

MR. DE VRIES:  Yes, Your Honor.

And my colleague, Ms. Schmidt, reminded me.  One thing that we would like to do, with Your Honor's permission, of course, is reserve some of our time for rebuttal.

And then, in that rebuttal section, I think we'll probably just need to do something very similar to what we are going to do in our opening presentation, which is have a part that will be confidential and a part that's open to the public.  At least that's what we would propose.

**THE COURT:**  Right, because it will last have been -- well, we might start with the open and then the closed being the last part, just in terms of going back and forth.

But, yes, that is fine to save some for rebuttal.

**MR. DE VRIES:**  Yes, Your Honor.  Thank you.

**THE COURT:**  And how much are you requesting?

**MR. DE VRIES:**  We understand that the hearing will be three hours.  And so, if our understanding is right that we have half of that, approximately 30 minutes or so, between 20 and 30 minutes.

**THE COURT:**  Okay.  I'll keep an eye on that.

**MR. DE VRIES:**  Thank you.

**THE COURT:**  Okay.  Thanks.

**MR. CLOERN:**  Thanks, Your Honor.

**THE COURT:**  Thank you.

And thank you for meeting and conferring to try to make this work and trying to balance the Court's interests which I had in trying to have as much as possible be open, but I also need to learn enough from you-all that -- about stuff such that we can --

(Laughter.)

**THE COURT:**  -- proceed in a fruitful way.

All right.  So with that, are we beginning with the closed portion?

**MR. DE VRIES:**  Yes, Your Honor.  Yes, please.

**THE COURT:** Okay.  Yes.  Make it available after -- yes.

So for those who are members of the public who are listening in, including the media, we are moving to closed session, as you just heard.  We're going to be having several sections which are open.  So the phone line will be reopened during those time periods.

We are moving to closed proceedings.  And so, from here on out, once the courtroom has been cleared, this transcript cannot be accessed except for -- by the outside attorneys of record and --

**MR. CLOERN:**  Sorry, Your Honor.  Just one more quick housekeeping item.

**THE COURT:**  Yes.

**MR. CLOERN:**  We -- the defendants raised objections to arguments and evidence in the reply brief of Plaintiff Apple, and I think there was a motion to strike in those objections but also an alternate -- alternate proposal and -- and counterevidence to the new arguments that were provided.  And then Apple also moved, I think, to strike our counterevidence or to otherwise respond to it.

And I just wanted to -- that's on the record.  We don't think that's going to be a problem today.  Our suggestion would be that everybody moves forward, all objections are preserved, we use what evidence we want to use today, and that can be

addressed at a later point.

**THE COURT:** I agree with that.

**MR. CLOERN:** Okay.

**THE COURT:** It's helpful if you-all -- if it's something which is very clearly -- is at issue, if you could try to note it, when you can, when it comes up, it's helpful. But outside of that, we're going to have to sort through it all --

**MR. CLOERN:** Sure.

**THE COURT:** -- as we're working through the order.

**MR. CLOERN:** We are, and I think what we were trying to avoid is -- we don't want to object a lot during their presentation. You know, that breaks it up. And so --

**THE COURT:** That's fine. I hear what you're saying.

**MR. DE VRIES:** And we'll do the same. We won't be objecting during theirs.

**THE COURT:** Okay. Give us one moment. We're going to now actually officially close, and manually close, the courtroom.

And, Madam [sic] Court Reporter, I know that you are remote today. If you have any issues, please just speak up. So -- and I will ask all counsel to use the microphones today throughout, given that we have a remote court reporter.

(Pages 11 through 60 were placed under seal by Order of the Court.)

**THE CLERK:**  All rise.

**ZOOM RECORDING:**  Recording in progress.

**THE CLERK:**  Court is back in session.

**THE COURT:**  Please be seated.

**MS. SCHMIDT:**  Good afternoon, Your Honor.
May I proceed?

**THE COURT:**  Yes, you may proceed.

**MS. SCHMIDT:**  Thank you.

So, Your Honor, just to orient the Court, I was going to round out the likelihood of success by discussing the enforceability of Dr. Shi's IPA and then move to the additional *Winters* [sic] factors, if that is all right with Your Honor.

**THE COURT:**  You sound a little bit soft.  I just want to make sure the court reporter can hear you fully.

It's okay?  All right.

**MS. SCHMIDT:**  Okay.  I can -- I can get closer and speak up as well.

**THE COURT:**  Oh.  That works.  That works well.

**MS. SCHMIDT:**  Perfect.  Thank you.

All right.  So, Your Honor, with respect to -- to Dr. Shi's IPA, the -- oops.  Thank you.  The IPA that Dr. Shi has with Apple does not restrain Dr. Shi from any lawful profession, trade, or business.

It is not -- and Dr. Shi, in fact, presents no evidence supporting his assertion that his IPA acts essentially as a

de facto non-compete, which is what the case law, including Dr. Shi's case law, like *Brown*, says is the -- is the test in these circumstances.

And courts routinely recognize, including in *Fowler*, which we cite in our brief, that agreements like Apple's that are designed to protect an employer's proprietary info- -- information do not violate Section 16600.  And Apple's IPA, which we have here on Slide 167 -- it protects information not generally known outside Apple and/or kept confidential by Apple, including trade secrets.

That does not prohibit Dr. Shi from working in the health sensor industry.  And, in fact, it doesn't even prevent -- it shouldn't have even prevented Dr. Shi from working at OPPO and InnoPeak.

If we could get Slide 175, please.

At -- on the bottom of this slide, Dr. Show -- Dr. Shi's agreement with InnoPeak prohibits him from using third-party confidential information in his job.  Dr. Zeng testified repeatedly that it's their policy not to use third-party confidential information, although -- although that policy was clearly breached.  There is nothing at InnoPeak based -- at InnoPeak or OPPO that requires Dr. Shi to use Apple's trade secrets in his work there.

If we could go to 168, please.

And Apple's IPA is consistent with the -- with the types

of confidentiality provisions that were upheld in *Olson* and *Galderma*.  Like -- like Apple's provision, they protect -- they protect -- these provisions protected the companies' confidential information, and the courts -- courts agreed that that was permissible.

This is unlike *Brown* and *Hanna*, which we have in the next slide, where the agreements were so broad as to cover any information at all related to the prior employer's business, even if it wasn't actually that employer's information.  And that type of agreement, not like the one that Apple has, is a de facto non-compete.

For example, in *Brown*, the agreement effectively prohibited the use by the employee of any information related to the securities industry, whether or not it was for former employers.  That is not what Apple's agreement does.  And, in fact, the -- the *TruConnect* case that Dr. Shi cites, I think, is illustrative here.

In that case, the court severed a -- a provision in the confidentiality agreement.  What you see here on the -- up top of the -- what's highlighted in yellow, that is a *Brown*-like provision that talks about any information concerning -- concerning the business is -- is -- is confidential, and the employee -- employee can't use that.

The court said that's -- that's too broad, whereas the portion in blue, information about products, drawings,

processes of -- of TruConnect -- that was okay.  The court said that was enforceable, and that is -- that is like Apple's provision.

And so there is nothing -- nothing inconsistent with 16600 -- nothing in Apple's IPA is inconsistent with 16600, and the agreement is enforceable.  Unless Your Honor has questions about that --

THE COURT:  No questions.

MS. SCHMIDT:  Thank you.

I'm going to move to irreparable harm.  And so, Your Honor, as Mr. Alper explained in detail, Apple's trade secrets have been disclosed and used at OPPO and InnoPeak. That is irreparable harm.

The case -- cases routinely recognize that the loss of a trade secret to a competitor, which -- there's no dispute that OPPO is a competitor of Apple.  A disclosure of trade secrets to a competitor constitutes irreparable harm because those trade secrets are now out there.

And -- and -- and that is -- it's not just the -- and we're not just saying that happens in every case.  It particularly happens here because Apple has now lost a competitive advantage that it had because the way that Apple does the -- the -- Apple does its thermal sensing, the way that Apple designs engineering strategies, information related to Apple's PPG headphones -- that was all developed, at great

expense, by Apple over years and years and years.

And now their competitors, OPPO and InnoPeak -- and I'll explain why InnoPeak is a competitor -- have that information, and they were able to leapfrog everything Apple did, and they basically just got a gift wrap.  "Here" -- "here's how to do everything" -- "here's how to do this."  They -- they got it from Dr. Shi, and that is irreparable harm.

And case after case recognizes that.  That's -- that's the cases we have on the slide, *Mu Tech*, *Eurofins*.  The *Cutera* case, I think, is very informative.  There, the -- the defendant had used at least some of the information to its advantage, and -- and something that the court looked at was whether -- was whether the -- the -- how the defendant company viewed the information.  Were they excited or interested in it?  And -- and they were.

And here, we have the same thing.  You have Dr. Zeng, you know, interestedly asking Dr. Shi about what Apple was doing with -- with PPG sensors.  You have 300 OPPO and InnoPeak engineers attending a presentation by Dr. Shi that was advertised as -- that he was going to reveal Apple's trade secrets.

And -- and so, Your Honor, we think, in these circumstances, the irreparable harm is clear.  Mr. Land [sic] also laid out evidence supporting the irreparable harm in his declaration.

Mr. Schlaifer, could we get that Paragraph 25, please.

This is -- this is Paragraph 25 of Mr. Land's declaration, where he explained all of the work that Apple put into each of the trade secret -- trade secrets that are, again, defined -- described in even more detail in his declaration and that Apple closely guards them and the benefits that a competitor would get by having that information.

And this is just the introductory paragraph to Mr. Land's declaration. It goes on and on to describe, in detail, all of the work and all of the -- the technical information that a competitor would gain from each of the trade secrets -- if we can take that down, please, Mr. Schlaifer -- and that's backed up by Dr. Sarrafzadeh's declaration.

Just as an example -- just as an example -- and, in fact, for each trade secret, Dr. Sarrafzadeh explains how a competitor like OPPO and InnoPeak would benefit from knowing -- knowing Apple's trade secrets. And an example, which I'll just discuss at a high level so we don't get into confidential information -- Paragraph 136, and this relates to the thermal-sensing trade secret.

And he describes how the technology was developed by people with detailed knowledge, extensive skill sets, cross-functional teams, and that even to just put a team together like that would be very expensive and very difficult. And that's a significant barrier to entry that OPPO and

InnoPeak no longer face.

In addition, now OPPO and InnoPeak know what Apple has selected with respect to its research.  And not only is that a benefit to knowing what Apple's done, but now they know that it works.  And so that, again, is a significant benefit and an irreparable harm.

And it's also -- and, Your Honor, I think it's really -- and so what -- what do defendants say?  Right?  And so what I think you'll hear from defendants is that Apple wasn't specific enough about its -- its harms.  And defendants make that argument based on, one, a case that was not cited in their briefing, the *Concord* case.  And I -- I don't believe we saw it, nor does the supplemental authority come across on that.

But their -- their argument, one, is that we're not specific enough.  But respectfully, we put in significant evidence, based on Mr. Land's declaration and Dr. Sarrafzadeh's declaration, on the harm.  There's also extensive evidence of use.

And I think, Your Honor, in the -- in the *Concord* case, which was a copyright case, as Your Honor knows because it was yours -- and so, to the extent the Court considers it, I think that case is vastly different from ours, given that the plaintiffs in that case were a licensing entity.

And so they -- they would license the -- the copyright, which, by definition, is a type of -- like, it's monetary.  So

if you lose out on licensing revenue, that is something that is monetary, whereas, here, Apple does not license its trade secrets.  It keeps them secret.  That's the whole point.  That is their value, as -- as we have explained in detail.

And what InnoPeak says is that, "Well, we don't compete with Apple.  We don't have products.  We don't compete with Apple," except what you saw, from Mr. -- Mr. Alper and Mr. De Vries, is that OPPO uses InnoPeak to do research for its products.

And I -- I won't go through all of these slides because they were on the confidential record, but what you can see is -- is that Dr. Shi arrived.  He reveals -- this is on Slide 29.  He reveals Apple's plans to release a PPG headphone.

THE COURT:  One -- one moment.

Let's stop the clip for one second.  It doesn't appear that the slides have gone down with that --

MS. SCHMIDT:  Oh.  I apologize. Yes.  Thank you.  I'm sorry.  Mr. Schlaifer is always listening for my cues.

(Laughter.)

MS. SCHMIDT:  Can we get Slide 173, please.

And so what -- what InnoPeak will say -- I expect they'll say -- is that they don't -- they're not competing with Apple, and I won't show these slides because they were during the confidential section.

And -- and what you'll hear is that, "Oh, InnoPeak was

already working on PPG sensor headphones.  They were doing it before Dr. Shi got there," except they don't have any documents showing that.  Instead, what the documents show is that Dr. Shi arrived -- this is on Slide 24 -- or excuse me.  Don't show it, please -- on Slide 29.

He -- he gets there.  He reveals Apple's plan.  Then -- and then what happens is he then -- and this is showed on Slides 94 and 95.  He then is put in charge of the -- the project.  He's put in charge of the project at InnoPeak.  He's leading it.  He's or- -- he's telling them, "Here's what you order.  Here's what you do."

And -- and then, as -- as Mr. Alper explained, in Ms. Hawes's declaration, she says, "Now I'm in charge of that project."  So that project is continuing, and -- and that project, which -- as Ms. Hawes describes it, and also Ms. Yin describes in her declaration, that project is for OPPO.  It's work that's being done for OPPO.

So the idea that -- that InnoPeak's use of the trade secrets is not somehow harming Apple because they may not release an InnoPeak-branded product is -- you know, that's an -- that's an excuse.  I think that doesn't matter.  They are using the trade secrets for what will potentially be a commercial product.

And I'll just briefly hit -- I'm not sure if Your Honor has questions about that --

**THE COURT:** No questions.

**MS. SCHMIDT:** -- balance of the hardships just briefly.

I think -- the hardship to Apple, I think, is clear. And while defendants say -- and can we go to the next slide? And while defendants say that -- that it would be an immense hardship for them to comply with the injunction, that just can't be squared with their -- their other arguments that, "We're not using the trade secrets. They're" -- "they're worthless. They're not what our" -- "they're not what our products do."

So on the one hand, they're saying, "Oh, it's very burdensome for us not to use Apple's trade secrets for balance of the hardships." And on the other hand, they're saying, "Well, we don't want them at all. We're not using them."

And -- but in any event, Your Honor, despite those conflicting positions, their own policies prevent the use of third-party confidential information. So, one, should -- it's not a hardship to stop using someone's stolen technology. But, two, they would simply be complying with the very policies that their own company has set.

And in addition, they haven't set forth, in detail, any specific harms that -- that would occur if they had to stop using Apple's trade secrets. They -- they present -- and I think you'll hear about -- from InnoPeak about Ms. Tan saying

that there would have to be research projects that were set down -- shut down.

Well, we asked Ms. Tan, at her deposition, "What projects would those be?"  She could identify none.  OPPO did not identify any projects or products that -- that it claims it would need to change in the event of an injunction.  This is not evidence of -- of any hardship at all.

And I do just want to touch briefly, just given the time, on -- on Dr. Zeng because I know that -- that that was a hardship issue that OPPO raised.

Now, if we go to Slide -- the next slide.

So OPPO claims that they will suffer a hardship if Dr. Zeng remains on leave, and the reason for that, they claim, is that -- is that Dr. Zeng -- you know, he's -- he's essential to their projects and is leading -- leading many of them, and they've -- they've fallen behind.

But as their own documents show, which we have on Slide 177, that was happening when Dr. Zeng was there.  This is an OPPO report from June, this -- this past summer, saying that they're already struggling to deliver, and they lack technical engagement.  And so OPPO has offered no evidence that any of these issues are new or, in any way, related to Dr. Zeng.

And -- and in addition, Your Honor, Dr. Zeng's deposition testimony, I think, reveals a significant risk, if he goes back to work, of further disseminating Apple trade secrets.  And

I -- just in the -- in the interest of time, I will just highlight some items very quickly, but Dr. Zeng -- I mean, Dr. Zeng's deposition is Exhibit 1.  This is Exhibit 1 to OPPO's brief, and it is Docket 219-1.

You can take that down, please, Mr. Schlaifer.

And what Dr. Zeng says is -- you know, we asked him questions about his communications with Dr. Shi.  And so, for example, this is on Pages 57 and 58 of his deposition.  We asked him about the communications with Dr. Shi, about when Dr. Shi said he was reviewing internal materials before he came to Apple.  This is the WeChat messages --

THE COURT:  Uh-huh.

MS. SCHMIDT:  -- and we said, "When Mr. Shi" -- "Dr. Shi said he was going through various internal materials, he was referring to Apple materials; correct?"

And Dr. Zeng's answer was, "So yeah.  Again, I want to -- because this is where you guys sort of made the wrong allegations.  So I only want to be accurate.  So he said 'review material internally.' If you have Apple material, that phrase 'Apple material' means confidential material only?  I don't think so because, even in Apple, for engineering teams, there are vast majority of materials that are actually publicly available.  Of course, there are confidential materials.  While he was working there, I think reviewing that is fine."

And so Dr. Zeng is saying first that reviewing materials

internally while at Apple -- maybe Dr. Shi was talking about public materials, but he also acknowledges that Dr. Shi probably was talking about Apple confidential materials, which Dr. Zeng then says is fine because he was at Apple then, except the whole point of that was to bring materials over to Apple, although -- or excuse me -- bring the Apple materials over to OPPO.

And then just another -- just briefly, to -- to highlight --

**THE COURT:**  So, Ms. Schmidt, just as a heads-up, we are at about an hour and 20 now.

So --

**MS. SCHMIDT:**  Thank you, Your Honor.  I will be -- I will wrap this up very, very briefly -- or very quickly.

So -- and I think the other -- the other thing to note about Dr. Zeng is -- is that he continues not to acknowledge that any of the information in Dr. Shi's presentations was Apple-confidential.  This is on Page 116 of his deposition.

And on Page -- and on Page 160 -- and on -- pardon me. 116 is where he's asked about the August 1st presentation, and he just says, "No.  That's all" -- "that's all public, generally known information," the same thing on -- on Page 118.

And -- and so even if Dr. Zeng were to go back where he's been -- he not only encouraged the disclosure of this information, he does not recognize it as confidential, which

would only heighten further the disclosure of Apple's -- the Apple trade secrets in defendants' possession.

Thank you, Your Honor.

THE COURT:  Thank you.

And just to put a pin on it, in terms of when we come back to Apple and -- why don't you go ahead and come up.  I think the concerns I had, in terms of reviewing the papers, is the scope in which ones were trade secrets.  And you-all have covered that during the first part, during the closed portion.

But I think some of the things you just raised really go to this question, which can be addressed in rebuttal and such, which I have no doubt the defendants are going to raise, which is this question of the scope of the relief which is being sought, and what does that look like, especially as to each of those categories.

First of all, how soft -- you know, is that truly a trade secret?  To what extent, what -- what parts of the information, but then how does that play out?  Which I think you were trying to touch upon with Dr. Zeng, but I think -- has the breadth of the proposed order.

So --

MS. SCHMIDT:  Yes.

Thank you, Your Honor.

THE COURT:  Okay.

MR. CLOERN:  Your Honor, may I put the box on the

podium?  My eyes are bad.

THE COURT:  Oh.  I'm with you, and absolutely because my eyes are bad, too.

So --

MR. CLOERN:  Just -- as long as there's good distance.

MR. SCHMIDT:  Do you need a copy?

THE COURT:  Thank you.

My iPad just died.  That is perfect.  Thank you so much. So I will take that, speaking of bad eyes.

THE CLERK:  Do you have an extra -- how many --

THE COURT:  Do you -- do you have an extra version for my staff?  Do you have one more extra, by any chance?

MR. CLOERN:  You need one more?

Do you have one more?

THE COURT:  Mr. De Vries, do you have one for me --

MR. DE VRIES:  Oh.  I just -- I realized I had neglected to ask Your Honor if you'd like a hard copy as well.

THE COURT:  Well, if you have a hard copy, I will absolutely take it because I will need it for the second half.

MR. DE VRIES:  Okay.  And, Your Honor, for your staff as well?

THE COURT:  Oh, that would be wonderful.  Thank you so much.

All right.  You may begin.

MR. CLOERN:  Thank you, Your Honor.

Good afternoon.  May it please the Court, I'm Boyd Cloern, counsel for OPPO.  I -- I'd hate to burn my time with some Whac-A-Mole, but I -- there have been some misrepresentations that I -- I want to quickly address.

THE COURT:  Okay.

MR. CLOERN:  I'm going to pull up some of their slides, some Mr. De Vries's used.

We have mapped what we believe to be the part you might object to, the AEO part.

So can we look at Slide 28, please.

So, Your Honor, this was a slide -- I think the representation was that his salary went from 250,000 up to 525,000 and that that somehow, you know, suggested there's a payment or quid pro quo, "Hey, steal some documents," not true.

The 200- to 250K message -- that was about a salary if Dr. Shi went to China, and that's in RMB.  If you look at the actual documents, it's clear.  That's 200,000 RMB for a job in China.  If he took the job in the U.S., it was always going to be at a 500,000-dollar level.  And he actually wanted, I think, 600,000, and they ultimately settled on 525-.  So there's not some sort of hinky salary stuff going on.  That's just a misrepresentation, and I'm pretty sure they know that.

So another one, Your Honor, is -- and I want to look at Slide 14.  So I want to be -- they put this slide up, and I think what they're suggesting is that this shows that there are

Apple confidential documents, ones from Mr. -- Mr. Roffman's list that were actually on Dr. Shi's InnoPeak laptop, and that is just not true.

This is an OGuard log.  What's referenced here is actually one document.  There's four rows because this is about activities --

**THE COURT:**  Uh-huh.

**MR. CLOERN:**  -- and there were four activities with respect to one document that got renamed.  We know what this document is.  It is InnoPeak 817, Bates number.  It is an early version of -- it's a draft slide from the August 1st presentation, which I'll refer to as the OTalk presentation.

**THE COURT:**  Uh-huh.

**MR. CLOERN:**  So these are not the allegedly stolen Apple documents.  They are not.

So Dr. Shi's InnoPeak laptop has been seized.  The reason we know this and have these logs and had the document to produce in the first place -- that's because there's what's called CrashPlan, which is disaster recovery software.

And so there was an image of Dr. Shi's laptop.  It was searched, and there were no -- none of the documents Apple alleges were stolen and have confidential information in them -- none of them were on there.

There are two documents from Mr. Roffman's list that were found.  One was Dr. Shi's résumé, and one was a paper Dr. Shi

wrote when he was a grad student. Both, Roffman says, are nonconfidential, and he agrees. Those are the only two documents that he can trace that came from Apple to the Seagate to the OPPO -- OPPO -- to the InnoPeak laptop. That's it, no others.

So, again, what this slide refers to is a -- is one of the draft presentation slides. That's all. So, look, I want -- I want to make sure, then, we all understand what this case is about.

Apple, five months ago, came to court screaming that there was an emergency. "Oh, my gosh. Hundreds of technical documents have been stolen," that Dr. Shi took them on his way out the door, that he was encouraged to do so by folks at OPPO, and that Dr. Shi has shared those documents with OPPO and InnoPeak. That was the original claim. That is not the case now.

Now, this case isn't about those documents, at least not with respect to OPPO and InnoPeak. The only thing that's alleged to have been misappropriated, the only information of Apple that Apple alleges has been conveyed to OPPO and InnoPeak, is information -- is -- is eight slides. You asked Mr. De Vries how many documents. He said nine. It's actually eight, and it's not even eight whole documents. It is eight individual slides.

There are two slides from a July 16th presentation, two

slides -- and that's a wrist temperature presentation --

THE COURT:  Uh-huh.

MR. CLOERN:  -- two slides from an August 1st presentation, the OTalk -- actually four, but two are the same as in the wrist temperature presentation -- and then two slides, individual slides, that are a one-off PPG -- about -- about a PPG sensor.  That's it.

THE COURT:  So this is the fourth time that's been raised in terms of both -- by both sides.

MR. CLOERN:  Uh-huh.

THE COURT:  And so the term "PPG sensor" -- I'm assuming that we are doing -- speaking about that in open session at this point.

MR. CLOERN:  It's in public, kind of, stature.

THE COURT:  I know.  It's been highlighted at different points as redacted.

So --

MS. SCHMIDT:  Yes, Your Honor, at this level.

THE COURT:  Okay.  I was just making sure.

(Court reporter requests clarification for the record.)

THE COURT:  Thank you.

MR. CLOERN:  Thank you, Your Honor.

Okay.  So that's all the case is about; right?  And, look, the -- so -- so I'm going to talk about irreparable harm, and it's really important to understand the information at issue

because the courts -- for there to be a preliminary injunction -- right? -- irreparable harm is a prerequisite, and so irreparable harm from what?

Well, for an injunction against OPPO or InnoPeak, it's not irreparable harm from a hundred-plus stolen technical documents because OPPO and InnoPeak don't have them, and there's no longer a claim that they do in this story. The only information that's at issue is the information in those eight slides.

This is a trade secret case. So information is the issue, and -- and the only harm is going to be use or disclosure of that information.

So the fact that information was disclosed in those two presentations, the OTalk and the wrist temperature presentation, and that there were two other individual slides that were disclosed, that they were disclosed in the past -- that is a merits issue. Is that a misappropriation? Is there damage from that? Maybe, maybe not. That's a merits issue.

We're here on a preliminary injunction. For a preliminary injunction, there's got to be ongoing harm. An injunction enjoins something, stops something that's going on, something that's causing somebody harm. If that's not happening, there's no point for an injunction. We don't need a fireman if there's no fire.

Okay. So what is the harm? That's the question from the

information on these eight slides, and there's not any,

Your Honor.  So these present- --

**THE COURT:**  Well, I think that they would say that the harm -- that Apple would say that the harm would be the prod- -- the product production in terms of the PPG, and I think the other thing that they would say would be that possibly -- in terms of knowledge regarding the health sensors generally.

So --

**MR. CLOERN:**  Sure.

So, Your Honor, both of the presentations, both the OTalk and the wrist temperature presentation -- they were given once, six months ago.  The presentations have all been quarantined.  They've been collected.  They've been quarantined.  So there's no further risk of any future harm.  Importantly, those presentations talk about -- they address two -- two of the subject areas.  The OTalk was about concepts and methodologies in product development.

OPPO has its own product development process.  It's called IPD, Integrative Product Development.  Like Apple, that has a product development process that's written down in policies -- so does OPPO.  They're big, long, multiple policies, hundreds of pages, on all kinds of steps.

But at the overview level, what Dr. Shi presented in his OTalk about, "Here's an example of product development

steps" -- he says, "I will note that the" -- say this already matches up one-to-one with OPPO's existing IPD -- right? -- the basic overview level steps.  The point, Your Honor, is that OPPO has its own way of doing it already, and there is no evidence that it has been updated in any way.

We produced the documents.  They are the same as they were before Shi showed up.  It's been documented since 2020.  There is no change to OPPO's product development process, nor is there even any claim from Apple that there's any risk that it will be updated in the future, zero evidence on that, same thing about temperature sensing.

So the wrist temperature presentation -- that was presented -- it was actually -- it's two slides.  It was a discussion between Dr. Shi and two algorithm engineers on July 16th that lasted all of 30 minutes.  Our company witness, Dr. Peng, testified about this because he went and talked to those algorithm engineers.

The algorithm engineers -- and this is all -- this is all in Dr. Peng's testimony.  We can bring up his slide.  The algorithm -- here's what they said.  They said the information was -- it was basic.  There's this -- their heat flow model is a -- is just basic, how you sense temperature with a watch; right? -- using two temperature sensors.  That's just how everybody does it.

There was one bit of information on there that had some

specificity to it and that differed from the way OPPO already does it, and they said, "We don't want that. We like the way we do it."

So OPPO has temperature sensors. OPPO senses temperature, has since 2023. OPPO pro- -- uses that in ovulation detection, which -- which is the -- what's being discussed in those slides that Mr. Alper was talking about. OPPO does all that already. They have their own models and their own algorithms, and the unrebutted testimony is that the algorithms at OPPO were not updated and are not going to be updated.

They filter. They mask. They've got their own way to do those things. Everybody does those things. You have to. You don't have a credible sensing device that doesn't filter and mask data. OPPO's got their own way of doing it. They haven't updated it, they have no plans to do so, and there's no evidence otherwise. They don't even claim it. So let's look at what they do talk about.

Can we look at the slide from Mr. Land, please.

So Apple relies on two things: Number 1, Mr. Land; Number 2, Dr. Sarrafzadeh. Those are the -- for -- for irreparable harm, Your Honor. That's the only two pieces of evidence that they point to. That's it, 100 percent.

And so what does -- what does Mr. Land say? Well, out of his whole declaration, it's Paragraph 25. That's it. That's the only thing on irreparable harm, and it is conclusory, and

it is speculative.  It is just like the declarations that were at issue in -- in the *Concord Music* case.

So Land -- Mr. Land says Apple's reputation would be damaged if features Apple developed appeared in a competitor's product, "would" and "if."  At his deposition, he said it might impact Apple's reputation and could be harmful if the information -- if Apple's trade secret information were used.

So what is missing and -- is -- is any evidence that it -- that Apple's trade secret information -- there's ongoing use of it because there's not any, nor could Mr. Land provide that evidence.  He's an Apple employee.  So that's it for Mr. Land. Now let's talk about Dr. Sarrafzadeh.

In their reply brief, Apple cites to Section 9 of Dr. Sarrafzadeh's declaration, but that is his misappropriation section.  It's, like, a hundred pages long, and what it really does is go through and -- and does what Mr. De Vries did and says, "Well, this was copied" and what Mr. Alper did.  There are -- and can we bring up the -- yeah.

So on this slide, there are nine paragraphs where, in Dr. Sarrafzadeh's misappropriation section, he includes a cut-and-paste standard refrain about the consequences to Apple and says there would be consequences -- there's consequences to Apple if a competitor used the information on Dr. Shi's slides. A competitor could implement the information into its own products, which would, if that happened, enable it to offer

more competitive products at a lower price.

So, again, it's completely speculative.  That's all that it is.  It's nine paragraphs.  They're all the same.  They're all speculation.  None of them have any evidence about the IPD process being updated or temperature-sensing algorithms being updated.  There is no evidence of any ongoing or planned future use of anything from the OTalk or the wrist temperature presentation.

THE COURT:  In the context of a trade secret preliminary injunction --

MR. CLOERN:  Yes, Your Honor.

THE COURT:  -- the moving party -- is the moving party required to show that that technology or that trade secret had actually been incorporated?

Isn't this part of the whole point, to prevent the -- because what you're saying, in terms of the "could" and saying it's speculative, seems to imply that they must have incorporated it, that InnoPeak and OPPO must be using it in order to get an injunction.

Is that your position?

MR. CLOERN:  Absolutely, Your Honor.

So an injunction in a trade secret case -- so let's think about this.  What -- a trade secret case is about trade secret information and the misappropriation of it --

THE COURT:  Uh-huh.

**MR. CLOERN:** -- and what's the harm if it's used or if it's disclosed -- all right? -- if there's further dissemination, if there's further use.

An injunction is going to address not any misappropriation in the past; right? Your pipe bursts. Your basement floods. You shut off the water.

**THE COURT:** Uh-huh.

**MR. CLOERN:** You've still got to deal with a flooded basement, but that's in the past. What a preliminary injunction's about is: Is the water -- pipe still leaking? Is -- are things getting worse? Only then do you need a preliminary injunction.

And here, there's no evidence that there's any ongoing use or ongoing disclosure or dissemination of the information in the eight slides.

**THE COURT:** It seems like that might speak more to the efficacy of the interim measures than it, per se, reaches the con- -- there seems to be a logical leap slightly in that, that perhaps that goes to the -- the fact that the interim measures were effective, then, versus --

**MR. CLOERN:** Your Honor could not have made my point any better.

Apple came to court, and Apple said, "We have this big emergency," and OPPO and InnoPeak were a model of corporate compliance. So on a Thursday, the case was filed. The same

day, Dr. Shi is -- is -- is put on administrative leave, and everything is suspended.  Two days later, we began investigating the --

THE COURT:  But aren't you, Counsel, saying that, "Okay.  Well, at this point, then, that's fun" -- "fine.  We don't need any further" --

MR. CLOERN:  Right.

THE COURT:  -- "no injunctive relief until there's" -- "that" -- "that, basically, everything lifts"?

I mean, what is it to prevent -- I'm just following -- I'm just trying to follow your logic with this because then, at that point, it doesn't mean that the injunction is denied because of the efficacy, even though there is still plenty of runway for this case to be litigated.

MR. CLOERN:  So -- absolutely.  That's a hundred percent correct.

We did a good job, Your Honor.  The risk was that there were hundreds of documents floating around China at OPPO that are Apple's technical information.  That was the risk.  We moved quickly.  So over five days, Dr. Shi was put on leave.  Dr. Zeng was put on leave.  All -- everything was preserved, preservation notices out.

And by the -- the Tuesday, the following week, we had interim measures on place.  Two days later, I was in China, doing an investigation, where we turned everything upside down

and shook out the couch cushions, collected and ran search terms on almost 4 million documents.

There -- there are no documents at OPPO or InnoPeak to be used.  They present no risk of irreparable harm, or any kind of harm, to anybody because OPPO and InnoPeak don't have them. The only information at issue is the information in these eight slides, period, and that's in these defined cat- -- that's in these categories of temperature sensing, where OPPO already has its own algorithms.  And there's no evidence it's going to change those; right?

The evidence in Dr. Peng's deposition is to the contrary. The unrebutted evidence is that they decide -- they didn't use that information.

THE COURT:  But aren't you asking Dr. Zeng to return to work?

MR. CLOERN:  We are asking that Dr. Zeng return to work.

So, Your Honor, Dr. Zeng was put on leave because they're -- look, we had -- the playbook on responding to these kinds of trade secret claims is get in there and freeze everything.  The last thing you want is somebody who's accused to be left in the company because that opens us, them and the defendant --

THE COURT:  Oh, I remember.

MR. CLOERN:  -- up to spoliation and all that kind of

stuff; right?

THE COURT:  Yes.

MR. CLOERN:  It was for his own good.  It was for our own good.  It was the responsible thing to do.

OPPO is a big company.  They have 30,000 employees, hundreds of thousands of stores around the world.  They're a household name everywhere pretty much outside of America, and they have a compliance regime that is consistent with being a big global tech company; right?

And so they knew what to do.  They -- they -- they froze everything, and they immediately began investigating.  They made sure that there wasn't a leaking pipe still; right?  That's what they made sure of.  The interim measures did their job.  There's nothing left to do, and there's no evidence that the -- the information in those slides is going to be used.

And so I'd like to turn -- because I'm going to be close to running out of time --

THE COURT:  Uh-huh.

MR. CLOERN:  -- I'd like to turn to the hardships for a minute, to the balance of the hardships, because I think it -- look, it really connects in.

So can we please show -- bring up the first slide.

This is what the proposed order says, and -- and this is what, Your Honor, I think, is honestly -- Your Honor mentioned it.  It is the most shocking thing about -- about what's going

on right now.

**THE COURT:**  I don't think I used the word "shocking," Counsel.

**MR. CLOERN:**  You didn't.  You -- you mentioned it. I'm adding "shocking," and I'm going to explain why.

So the proposed order doesn't -- the proposed order just flat-out violates Rule 65.  Rule 65(d) says if you're going to have an injunction, you've got to tell the enjoined party what they can't do, what's in bounds, what's out of bounds.  That's statutory.

You've got to have clarity.  The -- there's a case -- a lot of cases a mile long that say that and every court, every region we have in the country.  You've got to have clarity. You've got to tell the enjoined party what they can and can't do.

Well, Item 2, the no-use injunction that we have here on the screen, says, "Don't use trade secrets.  And by the way, we have a temperature-sensing trade secret.  We have an engineering strategy trade secret and a roadmap trade secret," but it doesn't say what those trade secrets are.

Now, here's where it gets even better.  If you look at Apple's motion, what Apple's motion says -- and Apple's motion says, "Well, we'll help you out.  The temperature-sensing trade secret is what's in the" -- "the eight documents," these ones on the screen.

"The product roadmap trade secret is what's in these" -- "it's in these three documents, and the engineering strategy trade secret is what is in this document," this one exhibit. Now, I didn't put the face of them on there for obvious reasons, but the exhibit numbers are there.

Okay.  Now, here -- so the proposed injunction and the motion to -- well, the proposed order itself doesn't even have this much.  If you add in what the motion says, then the trade secret information that -- that Apple would like this Court to order OPPO and InnoPeak not to use -- that definition is in these documents, but guess what?

Next slide, please.

They're all AEO.  First of all, OPPO and InnoPeak don't have any of these documents.  They have no idea what they say. I can't give them to them because they're AEO.  I can't even tell them what's in there.  That's why they spent the whole afternoon outside in the hallway.

So let's put this absurdity together.  Apple is asking you to order OPPO and InnoPeak not to do what's in these documents -- that's how the prohibition of the injunction is defined -- and then -- and then don't tell OPPO or InnoPeak what they're prohibited from doing.

In fact, if they were to learn what they're prohibited from doing, it would violate Your Honor's protective order. That violates Rule 65, and it's the opposite of Rule 65.  It's

just unworkable.  It's crazy.  It makes no sense whatsoever.

And, Your Honor, Apple has known -- since it filed its preliminary injunction motion in November, they have known what this case is about.  They know this case isn't about all kinds of technology and hundreds of documents.  They know it's not about that.

That's why they focus -- and everything that you heard from Mr. De Vries and Mr. Alper was about the information on those eight slides.  You go back through -- that's all they're talking about.  That's all this case is about.  They -- they could have tried to tailor something to that, but they didn't.

All right.  So, you know, there's this great case from the Southern District -- and I'm running out of time.  So I'm going to wrap up.  But there's a great case -- and I -- I even think there's a movie now that's about to come out about *The Odyssey*, but there's a great case that quotes *The Odyssey* in this circumstance.

And what -- what the Southern District of California case says is it says --

THE COURT:  Southern or Central?  You had --

MR. CLOERN:  Southern.

THE COURT:  Okay.

MR. CLOERN:  Southern, yeah.

Sorry.  That's -- my southern accent, I think, is coming through.  It's hard to --

**THE COURT:** Oh. Okay. I have a southern accent as well.

So --

**MR. CLOERN:** Southern District, Your Honor.

So this creates a contempt trap. This is basically putting a blindfold on me and making me walk through a minefield. That's what -- that's what this proposed injunction does, and it's --

**THE COURT:** And that is the common tension in trade secrets cases, I mean, in terms of, "This is a trade secret. Don't violate it" and so forth. I agree that the language is very broad in this one, in particular, which is of particular concern.

But -- I mean, we -- courts deal with this. We figure out ways of handling situations and issuing preliminary injunctions sometimes in trade secrets cases; correct?

**MR. CLOERN:** Courts -- courts do. That's right, Your Honor.

**THE COURT:** Okay.

**MR. CLOERN:** Courts -- courts do. It is possible to be done. And the thing is -- is I know these guys. They're good lawyers. I've had a lot of cases against them. They are fantastic lawyers.

They knew what the case was about. They knew the -- the -- the temperature flow model, the -- all those specific

pieces of information that my colleague Mr. Schmidt's going to get up here and say all this is publicly known.  They know that that's what it's about.  They could have directed something to that, but they didn't.

We have a broad and unworkable injunction.  This injunction cannot -- it violates Rule 65.  If there's one thing we come out today with, it's that the proposed injunction doesn't work.  You can't define an injunction by -- you can't say, "Here's what" -- "you're not allowed to do five things, but you can't know those five things"; right?

And it's Apple's job to figure that out.  They are the plaintiff, and they've got to propose something that works, and what they have proposed doesn't work, Your Honor.  It is -- it is -- it puts us between -- and this is the great quote from the case I love -- between -- now I'm going to screw it up.  So I have to look at it.

THE COURT:  Sure.

MR. CLOERN:  It's the -- it puts us between the Scylla of not competing and the Charybdis of contempt; right?

THE COURT:  That's a good quote.

MR. CLOERN:  Okay.  All right.  Your Honor, I am -- I am out of time.  I will just conclude by saying that my colleague Mr. Dawson is going to talk on behalf of Mr. Zeng.

THE COURT:  Okay.

MR. CLOERN:  But, look, for my part in this, if

there's a preliminary injunction, it's going to be two or three years.  That's how long these cases tend to last, or we at least have to assume that; right?  That's how -- that would be how long the case would last.

And so keeping Dr. Zeng on the sidelines for two or three years is going to destroy his career.  He started OPPO Health Lab.  OPPO needs him there.  OPPO's going to have to replace him.  We can't have that ship not have a captain for the next two or three years.

And so what happens when, as I believe will certainly be the case, the jury finds that there's absolutely no liability for Dr. Zeng, and three years from now, and he has no career to go back to, that's irreparable harm, Your Honor.  And it's the only irreparable harm that's been identified so far.

Thank you.

THE COURT:  By all parties, including all the defendants, except for Mr. Zeng?

MR. CLOERN:  Yeah.

It -- well, I'm saying it -- it -- Apple has not identified irreparable harm.  Mr. Zeng has identified irreparable harm from what would happen.  I think OPPO and actual- -- so, certainly, OPPO and InnoPeak have also identified irreparable harm in -- in the hardships area because these -- this injunction -- again, it's the Scylla-and-Charybdis problem; right?

So what temperature-sensing can we do?

THE COURT:  But I think hardship in the scope of the -- I don't -- I don't think those are one and the same.

MR. CLOERN:  Right.

What I'm saying is that with this -- if this proposed injunction goes into place --

THE COURT:  Uh-huh.

MR. CLOERN:  And I think there was this claim that OPPO hasn't identified any projects that will be shut down.  Of course we have.  We do temperature sensing.  We have -- we've had temperature sensors and temperature-sensing functionalities since 2023.

How much of that can we do, given this proposed injunction?  What are we allowed to do with continuing to update and make our products better in terms of temperature sensing?  You know, we don't know those things with this proposed injunction.

And so that's why we do have, like, this question of, "Oh, my gosh.  Do we just not compete, or do we take the risk of competing?"  And that's a hardship problem.

THE COURT:  Okay.

MR. CLOERN:  Thank you.

MR. SCHMIDT:  Your Honor, Patrick Schmidt from Quinn Emanuel.

The first five or ten minutes of my presentation is going

to be public information.  So I'd propose going on the public record and then sealing the courtroom at the appropriate time.

**THE COURT:**  Yes.  We've been open this whole time.

**MR. SCHMIDT:**  We've been open, yes, Your Honor.

**THE COURT:**  Yes.

So -- just making sure.  Yes.  Thank you.

**MR. SCHMIDT:**  So the beginning part of my presentation picks up pretty nicely where Mr. Cloern left off, and that is with the trade secret identification issue.  And I think the problems that Mr. Cloern described are really a symptom of the way that the trade secrets have been defined, and I want to start there.

Mr. Fisher, can we go to Slide 26, please.

Now, the case law is clear in the Ninth Circuit that, in a merits-based analysis, the plaintiff bears the burden of proving that a trade secret exists.  And as part of that burden, they need to show or demonstrate the existence of a trade secret with the particularity necessary to separate it from matters of general knowledge in the trade.

Okay.  Now, in their reply brief, Apple has sort of made the claim that they don't have any responsibility to separate the trade secrets from public knowledge.  And they cite cases in the context of a motion to dismiss or a motion for a more -- more particularized identification of trade secrets, but those cases, Your Honor, are completely inapposite.

This is a motion for preliminary injunction.  This is a merits-based analysis.  They have the burden to show a likelihood of success.  They cannot meet that burden unless they satisfy an identification of trade secrets that meets the Ninth Circuit law that I'm showing on this slide.

Can we go to Slide 29, please.

Now, Apple has gotten extensive discovery over the past six months on their motion for preliminary injunction.  We've taken a number of depositions.  Thousands of documents have been produced.  And after all of that effort, they have utterly failed to make the particularized identification of trade secrets that the Ninth Circuit law requires.

And they could have tried to tailor their trade secrets to something more narrow.  They chose not to.  They strategically defined Apple trade secrets, on Page 4 of their motion, in the most generalized and broadest terms possible: thermal sensor trade secret, engineering strategy trade secret, product roadmap trade secret.  There is no further detail about what those terms mean.

All they do is provide a string cite of documents.  And these documents that they string-cite, Your Honor, are, in some cases, hundreds of pages long.  And I will concede that those hundreds of pages of documents have some Apple-specific information.  Some of that information may even rise to the level of a trade secret, but Apple has -- Apple has not

identified what specifically in those documents are the trade secrets for purposes of this motion.

There's vast amounts of publicly available information in those documents, and that leads to a critical deficiency in this case because, as Mr. Cloern pointed out, there is zero evidence that any of these string-cited documents ever made it to the corporate defendants.  There is zero evidence that these specific documents were ever disclosed to the corporate defendants.

Their theory of misappropriation is that isolated bits from those documents were put into separate presentations by Dr. Shi and then shown to the corporate defendants.  They have made no effort, in their expert declarations or in their motion, to establish that those isolated bits of information, which are now in those eight slides, are protectable trade secrets.

There's a consistent theme throughout their motion and their expert analysis, Your Honor, where they conflate the secrecy and the value of these documents that they string-cite as a whole with what they claim was misappropriated.  They say that what's valuable and secret are the documents as a whole. What they say is misappropriated is specific, isolated little pieces from those documents.

And it's strategic, Your Honor.  Identifying the trade secrets in this way allows them to cherry-pick anything that

they end up finding in our documents out of the hundreds of pages of those string-cited documents, and that's exactly what they've done, and that was what you heard for over an hour from Apple based on those eight slides.

Can we turn to Slide 30, please.

Now, without a particularized identification of trade secrets, it's difficult for the defendants to know what we're accused of and to mount a defense, and it's impossible for the court to tailor injunctive relief.  And Judge Alsup, from this district, held as much in the *RoadRunner* case that I'm showing you here on this slide.  This was a case for summary judgment.  And the case here, Your Honor, involved a compilation trade secret.

And what Judge Alsup said is when the trade secret is a compilation trade secret, the plaintiff has a responsibility to identify the specific assemblage of information that constitutes a trade secrets [sic] and to demonstrate that that specific assemblage meets the statutory requirements of a trade secret.  And when the plaintiff fails to do that, no defendant can mount defenses, no reasonable jury can enter findings, and no court can tailor injunctive relief.

Judge Alsup granted summary judgment.  There was no genuine issue of material fact based on the failure to identify trade secrets.  And under the logic of this case, Your Honor, we would submit that, on this basis alone, the motion should be

denied.

Slide 31, please.

Now, because Apple has failed to identify its trade secrets in its motion, we're left to infer what seems to be important to them based on their misappropriation theories. And as Mr. Cloern mentioned, what it really seems to boil down to is these eight slides, which I'm showing on this -- which I'm showing on my slide here.

And what I would like to do, with most of my remaining time here, is to walk through their misappropriation theories in detail and demonstrate to you why that information on those eight slides cannot possibly rise to the level of a protectable trade secret.

And at this time, I think we should close the courtroom, Your Honor.

THE COURT:  Okay.  All right.  And so, with that, we are going back into closed session for -- well, we'll see.

MR. SCHMIDT:  Probably another 35 to 40 minutes, Your Honor.

THE COURT:  Okay.  For approximately 35 to 40 minutes.

We will close the public line.  Members of the public or members -- or counsel from -- the courtroom is being cleared, and Madam Clerk will lock up the courtroom.

(Pages 102 through 136 were placed under seal by Order of the Court.)

THE COURT: So we are back on the record in Apple versus Shi.

Prior to going -- taking the brief recess, Mr. Yu had said, on behalf of InnoPeak -- and Ms. Schmidt had agreed on behalf of Apple -- that the remaining part of the proceeding could be open to the public. I'm just repeating it because I don't believe that made the record.

And so, at this point, we are back on the record. We are open to the public. Members of the public are welcome to join us. The door has been opened.

And so, with that, let's begin with Mr. Yu on behalf of InnoPeak.

MR. YU: Thank you, Your Honor.

And I understand there's been a lot of attorneys arguing today. So I'm going to try to keep my remarks brief and focused. And I really just want to focus on two things, which is the lack of --

THE CLERK: Oh. Sorry. Yeah.

MR. YU: All right. Two things, the lack of irreparable harm to Apple from InnoPeak and the significant hardship that my client will face under this injunction.

So Apple made a deliberate choice to name InnoPeak as a defendant. It has the burden of proof to separately establish specific evidence that would -- to justify an injunction against InnoPeak. It has not.

Now, Apple has made a variety of different assertions in this case that InnoPeak has used, or will use, confidential information belonging to Apple.  Respectfully, none of those assertions are supported by the record.  As we have discussed today, none of the Apple documents that Dr. Shi purportedly took are found at InnoPeak or OPPO, none of them.

There are no InnoPeak projects that used confidential or trade secret Apple information, and InnoPeak does not manufacture consumer products.  You're not going to find InnoPeak AirPods -- or competitor or InnoPeak smart watch.

That means that any risk of the loss of goodwill or harm to Apple's reputation is minimal from InnoPeak.

**THE COURT:**  So the argument that's being made is InnoPeak is the researcher arm of OPPO and so that, basically, the use of trade secrets in the development of -- the use of trade secrets by InnoPeak will have that harm.

So do you want to just address the role of OPPO versus InnoPeak head-on?

**MR. YU:**  Sure.

There are many problems with that assertion.  InnoPeak is a separate entity.  Ms. Tan's declaration explains how InnoPeak conducts projects.  It doesn't conduct research products on a freeform, willy-nilly basis.  It does them on a -- on a project-by-project, contract-by-contract basis.  If there was a project that would have used some sort of confidential

information, it would have been discovered.

My client is a company of less than -- or around a hundred employees.  Any search that would have been conducted -- and a thorough search was conducted in this case -- would have turned up evidence of the use of particular Apple trade secret documents or Apple information.  There has been none of that evidence, respectfully.

We do -- there is no evidence of the use of -- of trade secret information at InnoPeak, which means that this theory that -- that -- that InnoPeak would somehow use information and pass it off to OPPO is simply unsupported by the record.  And, in fact, why don't we just jump right now to -- to Slide 13.

The only kind of -- the only example of this that I've heard today, or I've seen in any of the papers, is this -- is a TWS project.  This is the project, I would say, very generally related to product roadmaps.  The problem -- there's many, many problems with this -- with their argument.  We don't think the underlying information that was disclosed is a trade secret.

InnoPeak itself had already been developing and began its own TWS project in May 2025.  This is attested to under oath by Dr. Jie Hawes, someone who was trained in the use of -- had already been researching the use of PPG sensors in 2024, a year before Dr. Shi joined.

But the other problem is that this information -- any information about the purported product roadmaps was released

in September of 2025 in Apple's, you know, public press release.  You can go on Apple's website right now and look at information that it contends is a trade secret.

So this is the only example, I guess, they've been able to cite this entire day of an ongoing InnoPeak project that somehow incorporated Apple trade secret information.  But even then, the requested injunction is overbroad and unsupported.  Remember, their no-use injunction broadly seeks to enjoin the use of information related to this particular project for over two years, the time from -- that this case will likely get to verdict.

That far exceeds the -- both the time period that Dr. Shi was at InnoPeak and would also create an absurd result where InnoPeak is enjoined from using information that's already been publicly released, that other research institutions or other companies have already been using by virtue of the fact that Apple chose to release it.  That's their only example that we've been able to see so far, and it doesn't bear muster in order to support a broad injunction in this case.

So with the remaining time I have, I just really want to focus on two points.  Let's go to Slide 6.

The first point I want to say is that we've heard a lot about forensics.  We've heard a lot about what Dr. Shi may or may not have done with his Laptop 1.  Respectfully, that -- that entire -- we dis- -- we disagree strenuously with what

they're saying, but the -- but that entire -- Apple's entire expert report, its analysis by Mr. Roffman, can be disregarded as irrelevant to this motion.  Why?

Laptop 1, the laptop that Dr. Shi was issued, was seized, which means it's been effectively quarantined from any of the parties in this case.  The only thing on an injunction -- because on an injunction, we have to look at ongoing or threatened misappropriation or the threat of the use of trade secrets -- is what is currently in the possessions of the parties.

And it's undisputed that there are no Apple documents -- none of the Apple documents that Dr. Shi purportedly took are found on any InnoPeak systems or any devices, which is -- you know, if you would -- I just want -- I want to remind the Court how this case began.

They began by asserting these claims of broad use of Apple trade secret information and trade secret documents.  If that was true, some of those documents -- likely, some of those documents would have appeared.  They did not.

THE COURT:  Where is Lap- -- can you go back --

MR. YU:  Yes.

THE COURT:  -- to the slide?

So where's -- so Laptop 1 has been quarantined.  Where is that?

MR. YU:  It's -- I think -- I believe it's with --

currently with the authorities, Your Honor.

THE COURT:  Okay.  And then we have Laptop --

MR. YU:  2, which has also been -- with the authorities right now.  None of the parties --

THE COURT:  Okay.

MR. YU:  -- have access to it.  That's why much of the evidence that we've been discussing today has been through other information related to those app -- laptops, like the OGuard logs and whatnot.

THE COURT:  Right.

MR. YU:  And although there's a dispute about that, again, bottom line, none of those laptops are with any of the parties, which means there's no threat anyone would use that or could even use that information in those laptops.

THE COURT:  Okay.

MR. YU:  Last -- I would also like to emphasize, again, because Apple can't show the use or disclosure of -- of these particular documents, they've shifted to [sic] their theory.  They shifted to a theory that Dr. Shi allegedly copied information and put it into presentations that he had.  Even then, they failed their burden to show any InnoPeak-specific evidence as to this -- as to those presentations.

The July wrist temperature presentation wasn't shown to any InnoPeak employees.  The August OTalk wasn't -- was shown to only two InnoPeak employees who attended, and there's no

evidence that any of them remembered what was discussed in that presentation or incorporated the information in the OTalk into an ongoing project.

The PPG specifications, we've discussed already.  The one thing I would like to highlight, of course, is that there's no -- there's no credible evidence that some of the information was even created by Dr. Shi.  Dr. Shi was working with other trained P- -- staff at InnoPeak who had Ph.D.s and were already familiar with the use of PPG technology.

Slide -- Slide 17, Brian.

And this makes sense because Dr. -- because InnoPeak did not ask or want Dr. Shi to disclose trade secret information. There's been a lot in the record today about the inducement and what the WeChats and communications say.  I'm not going to get into that because the record speaks for itself.

What I will say is that at -- as Grace Yin has attested to, all that InnoPeak was asking for was generalized information, generalized expertise that Dr. Shi had that he gained from his education.  Apple does the same thing.  Look to your right.  That's a public Apple job post.

When it seeks people to hire for health-sensing roles or other engineering roles, it demands that they have qualifications and experience with temperature sensing, thermal design, and with roadmap planning, the same categories of information that Dr. Shi and Grace Yin had discussed.  When

Apple does it, it's perfectly fine.  When InnoPeak does it, it must be evidence of inducement.  That doesn't make sense, respectfully.

So last- -- lastly, I'd like to end on what I promised that I would discuss at the beginning, which is the effect of this injunction.

Slide 14.

I've already described how overbroad and how harmful this injunction would be.  I just want to reemphasize what the effect would be on a company like -- of InnoPeak's size.  If it were enjoined from using -- from using -- broadly from using information already disclosed in the public or would have -- suffer a vague and overbroad injunction, it would have to lay off staff.

It's a research institute that only functions by conducting research.  There's no way around that.  Ms. Tan, InnoPeak's regional director, testified to that under oath.  She is the one that, if there is an employee layoff, if a project has to be shut down, she would know exactly how that's been affected and what would happen.

So I would just like to end by noting that the overbroad injunction that Apple's proposed has many flaws, but among them is it will have a real effect on my client in inducing mass layoffs that will be very hard for InnoPeak to recover from.

And for those reasons, and the other reasons that have

been articulated in the briefs and by OPPO counsel, I would strongly urge this Court to just -- to deny the motion as to InnoPeak.

Thank you, Your Honor.

**THE COURT:**  Thank you, Mr. Yu.

And last, but not least, Ms. Chang -- or --

**MR. DAWSON:**  Not quite last.

(Laughter.)

**THE COURT:**  Okay.

**MR. DAWSON:**  Almost last.

**MS. CHANG:**  Good afternoon, Your Honor.  Annabel Chang for Dr. Chen Shi.

Your Honor has already heard extensive argument from OPPO's counsel as to whether Apple has identified protectable trade secrets and whether they were even used at OPPO or InnoPeak.  So I'm going to focus on a narrow issue, which is whether Apple has shown a basis for a preliminary injunction against Dr. Shi personally.

And as the parties have already flagged for you, what Apple identifies as Apple trade secrets, in its preliminary injunction motion, are not narrowly defined technical secrets tied to specific documents, but there are these broad categories of information -- sensor methodology, engineering strategies, and product roadmaps -- and Apple is asking this Court to enjoin Dr. Shi from using any version of, or any

materials derived from or referencing, these categories.

He's already been sidelined from his profession for months while this case proceeds, and the injunction Apple is seeking is going to prevent him from working in his field as a health-sensing engineer altogether and for who knows how long.

And Your Honor has previously noted and has -- and today has already -- it's -- you already brought this up -- that any relief really has to be specific, non-vague, and tethered to specific nonpublic material.

But what Apple's seeking is the opposite; right?  They're effectively seeking a restraint on lawful work because, under California Business and Professions Code Section 16600, courts can protect specific secrets, but they may not impose de facto non-competes designed as confidentiality enforcement.

But even beyond the problem with the scope of the proposed injunction, Apple still has to show that Dr. Shi is likely to use or disclose Apple trade secrets going forward.  And on this record, it hasn't done so because:

Number 1, Dr. Shi hasn't performed any duties for OPPO or InnoPeak since August of -- August 20th of last year.  He -- he's remained on paid administrative leave since then; and

Number 2, his devices were immediately seized or quarantined around that time at -- both at San Francisco Airport and at his home; and

Third, as my colleagues have already talked about

thoroughly, there are no files, whether in -- in InnoPeak or OPPO's system.

So there is no downstream use, no possession, and no disclosure; right?  And without evidence that Apple information was actually being used or likely to be used, the extraordinary relief Apple is seeking isn't justified here.

And then Apple tries to fill these evidentiary gaps by pointing to forensic evidence and these presentations and communications, but none of that evidence actually is showing what it -- what they say it does.  For example, the -- the forensic evidence that they mentioned -- it's all -- it's really about inferences that they've drawn based on, you know, their expert -- Apple ex- -- Apple's own expert's testimony.

For example, they -- he did say that he could not determine whether these -- whether these alleged downloads were automatic synchronization events or user-initiated.  He didn't look at all of the file system data that was necessary to make that determination.  He didn't include P logs as part of his analysis.

So all of these hundreds of files that Apple's alleged -- Apple alleged were downloads could -- could very well just be these automatic synchronization events as opposed to distinct downloads.  And -- and ultimately, really, there's only five files that -- that are present on this folder that they call Apple-related, and there is no evidence showing any of these --

any of these files were ever used or disclosed or transferred, even accessed, after that.

And then, you know, they point to that OTalk presentation -- right? -- about these slides.  But, again, the evidence there is actually different; right?  He -- they first point out this Apple-branded language in this marketing flier that -- that looks suspicious.

But Dr. Shi didn't even come up with that language.  That language was come up with by an -- an OPPO marketing employee.  And when Dr. Shi saw that, he immediately asked them to remove it for his protection, and OPPO did so.

And second, as my colleagues have already highlighted, the presentation itself did not disclose Apple trade secrets.  There's just a bunch of similar-looking documents and sensor -- you know, sensor methodologies and engineering strategies that happen to look similar, but -- I mean --

**THE COURT:**  They're a little bit -- the circumstantial evidence on some of that is it's beyond just "happens to look a little similar."  They're pretty similar to the point that they raise, in terms of circumstantially -- raise a serious question.

**MS. CHANG:**  Yes, Your Honor, and -- and I believe my -- my colleagues have already addressed that.  Even if they did look similar, the underlying date -- the underlying methodologies and the information that was being relayed by --

by those slides was actually not trade secret, and it was based on publicly available information and patent --

THE COURT:  Say one or two of them were.  So in that situation, in terms of Dr. Shi, how would that change your analysis, if at all?

MS. CHANG:  If -- if you were to determine that certain information on those slides were to be trade secrets, I think you could fashion definitely a narrower order --

THE COURT:  Uh-huh.

MS. CHANG:  -- to the extent that it only allows for the no-use or no-disclosure of those discrete trade secrets, if those -- if those have been identified, but that's not what's happened here.

Again, as we've all been talking about over and over again, the scope of Apple's motion and their -- their proposed order is vastly overbroad.  It goes way beyond identifying those one or two items on slides.

THE COURT:  And your argument regarding the de facto non-compete, to some degree, relates directly to the notion of this very broad preliminary -- proposed preliminary injunction; correct?

MS. CHANG:  It relate -- it does relate to both, but I am focusing more on the scope of the PI motion -- of the PI relief.  It also goes to, of course, the likelihood of merits on their -- on their breach of contract motion because the

underlying contract as well is overbroad on that basis.

THE COURT:  Are you saying that over- -- that the contract itself is overbroad, or are you saying just de facto, in terms of -- in light of the preliminary injunction which is sought -- because the plain language of the contract, do you think, is overbroad?

MS. CHANG:  Yes, and that was that -- that issue was actually raised in our motion to dismiss --

THE COURT:  Uh-huh.

MS. CHANG:  -- because the definition of proprietary information in the IPA --

THE COURT:  Okay.

MS. CHANG:  -- is -- is overbroad, and it -- it's more than just trade secrets.  It really relates to anything related to Apple's products or services.  And, in fact, that's how it's defined in the IPA itself.

THE COURT:  Okay.

MS. CHANG:  Yes.

So moving on to the recruiting messages that were exchanged, which Apple, again, points to as -- as evidence -- but, really, these messages were taken out of context, and they're really just about recruiting, talking about the kind of general experience and expertise that Dr. Shi could bring over to OPPO.  And it's part of any standard recruiting discussion.

And, in fact, you know, the notes that Apple points to

about the two- to three-year roadmap -- those are shorthand notes that were done by Ms. Yin, who was InnoPeak's HR representative -- were just her writing down what she was getting out of this conversation, which was Dr. Shi talking about his experience working on these two- to three-year roadmaps.

But how do we know that?  She talked about it at her deposition.  She clarified that, "Yes, I wrote these down while I was talking to him.  And he was telling me, 'I had been work-'" -- "'I used to work on Ap-'" -- "'at Apple, and I worked on these roadmaps before.'"

But that's all it was.  There was no disclosure of confidential information, no disclosure of roadmaps.  And, in fact, in reality, like, when you actually look at what happened, none of -- none of those roadmaps ever made its way to OPPO or InnoPeak.  So the proof is in the pudding; right?

And -- and so -- and that testimony and that evidence is -- is really consistent on -- on all of that.  Dr. Shi testified he never pitched bringing Apple confidential information, Ms. Yin confirmed that no roadmap details were provided, and Dr. Zeng likewise confirmed.

So I -- my time's getting short, Your Honor.  So I'm just going to quickly close by just saying that that's the core problem with its motion -- right? -- is that California law allows employers to protect specific information, but it's

not -- it's not allowed to protect -- prohibit engineers from using the knowledge and experience they've gained, but Apple's motion effectively does that. And for that reason, I would urge you to deny it as -- as to Dr. Zeng.

Thank you.

THE COURT: Thank you.

All right, Mr. Dawson.

MR. DAWSON: Thank you, Your Honor.

I know time is tight. So I will be as efficient as possible.

THE COURT: You-all are over time, but at this point, I need to be. I mean, frankly, you have many more de- -- parties.

So --

MR. DAWSON: I do, and I do think I'm not going to retread ground. I think, for my purposes, I -- as Your Honor is called upon to balance the hardships in this case, there's a particular set of hardships applicable to Dr. Zeng that I wanted to make sure I flag for Your Honor. And they particularly relate to the fact that the injunctive relief Apple is seeking targets Dr. Zeng directly.

Particularly, the continuation of the interim measures would bar Dr. Zeng from pursuing his career at OPPO, all of the things he has built for years. And I want to go through a few of the details, not in excess, but I want to spell out exactly

how dramatic that would be.  And I want to start by reminding Your Honor of where the interim measures began.

As Mr. Cloern explained, this was an emergency procedure adopted to figure out what was going on.  The pipe was burst, and the company was doing everything responsible to figure out what happened.  It was an emergency measure that now has lasted six months, and it has served its purpose.  They were put in at a particular time for a particular -- particular purpose, and they have served that purpose.

Apple has scoured the emergency discovery.  If anything had been found linking Dr. Zeng personally to these eight slides, everything they have found, everything they have dug up in text messages, in depositions -- it's all before Your Honor, and as I'll get to later, it is all twisted and manipulated in a way to make it look as damaging as possible and out of context.  And I'll give you a little more explanation on that.

But to start, I want to talk about the interim measures as to Dr. Zeng, the hardship imposed on him.  Two to three years for a technology executive taken out of his job is a death knell for somebody's career.  It is -- as Dr. -- as Mr. Cloern mentioned, the company would be forced to move on, hire somebody to take Dr. Zeng's place.

There are only a handful of companies in the world that do this information -- or do this kind of technology.  If and when -- as we expect, when Dr. Zeng is fully exonerated, there

won't be a job for him to go back to, and the idea that he'll be able to find a comparable position at another company is fanciful.

Now, Apple responds to this by saying that there's no problem here because Dr. Zeng is getting paid.  And frankly, Your Honor, for somebody like Dr. Zeng, and for most people who care about their job, that's insulting.

Dr. Zeng isn't punching a clock.  He has poured his entire career into this technology and this work.  It's his life's work, and what they're asking is for him to effectively be precluded from pursuing his chosen profession for two or three years.  And even when -- when he is exonerated, forever he will have a hindrance placed upon him by virtue of the interim measures being extended.

Dr. Zeng, for 20 years, has done this work.  He has worked on developing heart pumps.  He has helped publish patents.  He has developed sensors.  He joined OPPO five years ago, helped build it from a tiny company to 120 engineers.  His team has obtained more than a hundred patents.  They have conducted original research.  They have served millions of customers.

This is a real science and engineering expert who is bringing a passion and dedication to his job.  Continuation of the interim measures would forestall that and prevent that. And the critical point, Your Honor, I think, is something you observed earlier, is that it is completely untethered from the

trade secrets at issue here.

A full bar on Dr. Zeng returning to OPPO, not to work on a particular sensor, not to communicate in a particular way, not to use a particular equation -- it's a full bar.  And the fact remains the evidence developed, the eight slides, the slide deck, the alleged trade secrets -- there is no distinction between Dr. Zeng's relationship to those and any of the other engineers who saw those slides.

It is -- there is no justifiable reason to single Dr. Zeng out for this punishment.  And I think the reason it's happening, Your Honor, if you look at the complaint, if you look at the WeChat messages -- we have a motion on file, and I would urge, Your -- Your Honor, don't take Apple's word for those messages.  Don't take mine.  Just look at the messages in a row, unfiltered, unvarnished.

They do not show what Apple alleges.  This was a -- a standard recruiting effort.  I believe it was -- Mr. De Vries said he was targeting internal.  There's nothing public about it.  There is all sorts of references in the chain to public information that Dr. Shi was analyzing and examining to come up to speed to come to OPPO.

I'll leave that there, but I think what the purpose -- the point is what is motivating this ask?  It's not connected to a trade secret.  The goal, Your Honor, is to punish Dr. Zeng. There's a punitive effort here because Apple believes he did

something wrong.  Apple believes he was the source.  We dispute that as vigorously as we can, and we'll get -- we'll be into that at a motion to dismiss.  We'll do that on the merits.

But even if there -- he had done something wrong, even if Dr. Zeng should have had an alarm bell go off at some ambiguity in Dr. Shi's text messages, it still remains the preliminary injunction is not a proper mechanism to punish somebody for their role.  It is only -- as -- as Mr. Cloern explained, it's about holding things steady.  It's about maintaining the status quo.  It's about preventing harm.

The only tangible, unavoidable, irreversible harm that's at stake here is what would happen to OPPO and to Dr. Zeng, in particular, if this broad, untethered injunction is put in place.  And the company doesn't know what's in or what's out.  Dr. Zeng can't pursue his career.  He can't continue to contribute to the wealth of knowledge in health sensing.

And ultimately -- Your Honor flagged this concern about that disparity, and that's what's driving our primary concern about those interim measures.  They play a role.  Apple has mentioned repeatedly, "Well, OPPO agreed to these at the beginning.  This shouldn't be a problem," completely ignoring the context in which they were entered.  It was for a particular purpose for a limited time.  That purpose has been served, and the interim measures should be extinguished.

Now, I know I'm asking for a lot here, Your Honor, but I

think Dr. Zeng's role is -- it can be cabined here.  The -- the fate of Dr. Zeng, the interim measures -- this is a discrete issue.  It is completely untethered to the trade secrets that Apple has alleged.  We would ask, Your Honor -- I know you have a lot of declarations, a lot of evidence to sort through. Those don't bear on Dr. Zeng's fate.

The interim measures were intended to be vacated and dissolved at the preliminary injunction stage.  We would ask Your Honor to dissolve them now while the rest of the motion is pending and being considered.  That's going to take time inevitably.

Dr. Zeng's fate -- he's been out of his job for six months, already longer than anybody expected, already untethered from the trade secrets at issue.  And so we would ask and beg Your Honor to consider granting that relief earlier than the rest of the consideration of Apple's motion.

Thank you, Your Honor.

**THE COURT:**  Thank you.

All right.  So returning back to Apple, you had -- now looking at it -- looks like five minutes remaining.  I'm going to give you a couple more minutes.  But given the court staff and everything else, we're going to need to keep it to, say, seven minutes.

**MR. DE VRIES:**  Keep it to seven minutes.

Okay.  Thank you, Your Honor.  That was just going to be

my one question.  I think, then, with that, although I may have had a couple words to say, I'll see if there's time at the end.

There were two issues that Your Honor identified, scope of the relief and then the protectability of the trade secrets, that I'm going to turn it over to Mr. Alper and Ms. Schmidt to address.

THE COURT:  Okay.  I mean, I think this is the issue which everybody is discussing.  So -- at this point.

So, Mr. Alper?

MR. ALPER:  Yeah.

I think we have to still (Inaudible).

THE COURT:  Well, let's stop for one moment.

So are we sealing for the rest?  Is there anything else which should be on the public record at this time?

(Court reporter requests clarification for the record.)

MR. ALPER:  (Inaudible) too early to make any --

THE COURT:  I mean, the other option is to begin with scope of relief, then.

THE CLERK:  You have to be at the microphone -- I'm sorry -- in order for the court reporter to take it down.

MR. CLOERN:  I'm sorry.

Your Honor, I think the scope of relief is exactly what the clients need to hear.  They're going to be at -- the OPPO folks have 40,000 -- it's a big company and --

THE COURT:  Let -- let's start with scope of relief.

**MR. ALPER:**  Yes, Your Honor.

**THE COURT:**  If we need to move to a closed session because we're getting very specific, we'll do so, but --

**MR. CLOERN:**  Thank you, Your Honor.

**THE COURT:**  -- let's start with scope of relief and then -- I mean, because those are the two things which I've been raising.  So scope of relief, and then, really, what are we talking about?

So --

**MS. SCHMIDT:**  Thank you, Your Honor.

May we get the slide -- or the screen, please.

**THE COURT:**  There you are.

**MS. SCHMIDT:**  And so, Your Honor, while the -- and if we can go to Slide 180, please, Mr. Schlaifer.

And so, Your Honor, on -- on this slide, it -- it summarizes the relief that Apple is seeking, but just -- before I begin, you know, this -- this slide is about what Apple is seeking.

And to be clear, defendants' position is that nothing at all should be entered, no interim measures, no injunction. They go back to business as usual with Dr. Zeng and Dr. Shi back to work.  That is what they think should happen here, and that -- on these facts, that -- that cannot happen.

And the only reason, Your Honor, that the -- that we have not seen more use and more dissemination is because Apple took

the steps to file this case.  What you saw at OPPO and InnoPeak, before Apple filed this case, were posters advertising the disclosure of revealing Apple's sensor design. That is what they were doing before we filed this case.

And so this was not a situation where they took it upon themselves to actually abide by the policy they claim that exists, that they -- that they respect third-party confidentiality.  They waited until they got caught, and then they tried to -- tried to make a show of saying, "Oh, look.  We stopped it.  There should be no injunction."

But, Your Honor, we establish that there is significant evidence of use.  And courts reject the argument the defendants are making that, "Oh, look.  We stopped it.  We" -- "we gave you" -- "we gave you the documents back" as a way to avoid an injunction.  And that's the *East West Bank* case, Your Honor. And in that case, the defendants had already used the documents while building a platform.  So it's not sufficient for them just to return the documents.

To find no likelihood of irreparable harm after a defendant returns the information it used to misappropriate the trade secrets would render laws, such as the DTSA, which protect trade secrets, moot.  And so it is no answer for defendants to simply say, "Oh, look.  We stopped, no injunction."  They have used the trade secrets.  I think that is clear.  An injunction should be entered.

Now, Your Honor, our injunction -- the way we -- the way we've phrased this -- there's -- there's two parts.  There's the part about what defendants should not do and what defendants -- the additional things the defendants should do.  And, Your Honor, they oppose all of this.

And in -- in particular, if you contrast that with what defendants have said about how, "Oh, look.  We" -- "we turned the couch cushions upside down.  We" -- "we shook them loose.  We looked through everything," look at what they're saying we [sic] shouldn't have to provide.

"We shouldn't have to provide relevant files from Dr. Shi and Dr. Zeng.  We shouldn't have to provide the forensic information that was agreed to be provided with respect to Dr. Zeng, and we also shouldn't have to tell you" -- "provide a detailed accounting of who Apple's trade secrets were disclosed to and how they were used."

And why do they say they shouldn't have to do that, Your Honor?  It's in Dr. Peng's declaration, in Paragraph 136.  He says it's too burdensome.  He says it's too hard to go and find out what -- how engineers are using Apple's trade secrets.  This -- this part -- this -- that's too much for them.  And, Your Honor, I think that's the bare minimum that you should do if what you're saying is, "We don't want to use this information," is to find out the extent of the dissemination.

And now, to be clear, and focusing -- and shifting focus

to the -- the -- the prohibit- -- the -- the relief that we're saying should be entered as far as the -- the two -- the -- the -- I think the more classic type of injunctive relief, interim measures should remain in place.  That -- there's no reason to discontinue the interim measures.

Can we go to the next slide, please -- please, Mr. Schlaifer.

And there's no burden on defendants for doing so because they -- they claim that they've complied with their discovery -- discovery obligations pursuant to the interim measures order.  They argue that up and down.  They say, "We complied, we complied, we complied."

And so maintaining that order, which includes 14 documents discussed in our brief, trade secret documents, and an additional 28 documents that are described in detail in our trade secret disclosures that defendants have and included in their briefing -- there's no reason to -- to remove the -- the interim measures order, given -- given these facts.

And now turning to the -- the scope of relief with respect to the -- the -- I guess the -- the additional portion on the -- specific to the trade secrets -- can we go to Slide 185, please.

Your Honor, we -- we tried to be -- craft this as specifically as -- as we could, and we used the *WeRide* case as a guide.  And so the language that we chose, the way that we

described the trade secrets -- we -- we tried to track that order because there was another order from this district.

And so we think that this provides, given the context of this case and the information that the defendants have -- I mean, they claim not to know what our trade secrets are.  They have three experts who submitted hundreds of pages of declarations.  They know exactly what our trade secrets are.

And those experts and their lawyers and -- can -- there -- there should be no issue with them complying with this order, given, one, they claimed to have complied with the interim measures order, which likewise had restrictions on outside public --

THE COURT:  Ms. Schmidt, I'm having challenges figuring out exactly the scope and breadth of the trade secrets.  So -- I mean, I'm trying to figure out -- well, perhaps this goes more to the trade -- to the closed session.

MS. SCHMIDT:  I -- I think it likely will, Your Honor.

And so if -- with that, Your Honor, if you'd like to switch to --

THE COURT:  Yeah.

I mean, if there's anything else we need to do on the public record --

MS. SCHMIDT:  No, Your Honor.

I think the -- I think what we would say, Your Honor, is that -- I think the way that we have described and defined the

trade secrets is consistent with how it's been done in -- in other cases.  And -- and I think, Your Honor, that this issue about -- and I think, Your Honor, as Your Honor rightly recognized, courts are able to navigate this issue in -- in case after case, and we think you can -- it's possible to do so here.

And with that, I'll turn it over to Mr. Alper to answer specific questions about the -- the trade secrets.

**MR. CLOERN:**  Your Honor, I -- while we're on the public record, I just want to clarify.  OPPO and InnoPeak are not seeking to bring back Dr. Shi at this time.  It -- we've -- we've investigated --

**THE CLERK:**  Can you come to the microphone?

**THE COURT:**  Okay.  So -- so what's --

**MR. CLOERN:**  At this point, she said we were, and we're not.  So I just wanted to clarify that we're not because we have investigated Dr. Zeng.  All of his devices -- there were eight of them -- were collected by Ankura, forensically searched, and so forth.  And he doesn't have any documents on any of his devices.

So Dr. Zeng, we think, can come back to work because we know he doesn't have anything, and we've turned all that over to Apple, the forensic reports.  But Dr. Shi -- his devices are -- are with the DOJ --

**THE COURT:**  Uh-huh.

**MR. CLOERN:** -- and we can't -- we don't know. So we can't bring him back, really, consistent with our own compliance policies, until we know.

And so for us -- I just want to make clear that's -- that's not on the table right now.

**THE COURT:** It's been stated on the record.

**MR. CLOERN:** Okay.

**THE COURT:** Thank you.

**MR. CLOERN:** Thanks. Thank you, Your Honor.

**THE COURT:** All right. It seems as though we're going to close the courtroom one last time.

**MR. ALPER:** One last time, yes, Your Honor. Thank you.

**THE COURT:** Okay. Well, to those who are here in the courtroom who will be leaving the -- thank you very much for getting up and down and up and down, but we're going to close the courtroom for one last time and go into closed session.

(Pages 166 through 179 were placed under seal by Order of the Court.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Please note:  This transcript is subject to the technological limitations of reporting remotely.

DATE:   Saturday, March 14, 2026

_____

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter